**Slip Op. 04-146**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

JAZZ PHOTO CORPORATION,

        Plaintiff,

v.

UNITED STATES,

        Defendant.

</td><td>

**Court No. 04-00494**
**Before:  Judge Timothy C. Stanceu**

**PUBLIC VERSION**

</td></tr>
</table>

[Judgment granted for plaintiff in part and for defendant in part]

Decided: November 17, 2004

*Neville Peterson LLP* (*John M. Peterson, George W. Thompson, Curtis W. Knauss, Maria E. Celis* and *Catherine Chess Chen*) for plaintiff.

*Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, *Stefan Shaibani* and *David S. Silverbrand*, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Beth Brotman* and *Paul Pizzeck*, United States Customs and Border Protection, Department of Homeland Security, of counsel, for defendant.

*Stroock & Stroock & Lavan LLP* (*Matthew W. Siegal* and *Lawrence Rosenthal*) and *Adduci, Mastriani & Schaumberg, L.L.P.* (*Harvey Fox* and *Will E. Leonard*) for *amicus curiae*, Fuji Photo Film Co., Ltd.

## OPINION

**STANCEU, Judge:**

Plaintiff Jazz Photo Corporation ("Jazz") is an importer of "lens-fitted film packages" ("LFFPs"), more commonly known as "disposable cameras," "single use cameras," or "one-time use cameras."  In this case, Jazz contests the denial by

U.S. Customs and Border Protection ("Customs") of its administrative protest, in which it

challenged decisions made by Customs on September 24 and 26, 2004, to exclude from

entry two shipments of Jazz's LFFPs that were entered at the Port of Los Angeles/Long

Beach on August 26 and 27, 2004, respectively. Customs acted on its conclusion that

Jazz had failed to prove its imported cameras were outside the scope of a general

exclusion order issued in 1999 by the U.S. International Trade Commission ("ITC")

under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 (2000)

("Section 337"). *See In the Matter of Certain Lens-Fitted Film Packages*, USITC Inv.

No. 337-TA-406, Pub. No. 3219 (1999). The ITC's general exclusion order applies to

LFFPs produced and imported by 26 parties, including Jazz, who participated as

respondents in Section 337 proceedings initiated by Fuji Photo Film Co., Ltd. ("Fuji"),

the holder of various patents used in manufacturing LFFPs.[1] In those proceedings and an

enforcement proceeding conducted earlier this year, the ITC determined that disposable

cameras imported by Jazz infringed patents held by Fuji.

All of the Jazz cameras at issue are "reloaded" cameras (also known as

"refurbished" cameras), *i.e.*, the cameras initially were manufactured by Fuji or one of its

licensees (Kodak, Concord, or Konica) and, after being used by consumers and collected

following photo processing, were fitted with new film and, in some instances, new flash

batteries. Jazz obtained the reloaded cameras from Polytech Enterprise Limited

("Polytech"), which processed the subject cameras at its facility in China. That

processing, the nature of which is one of the issues in contention in this case, consisted of

---

[1] Fuji has been granted *amicus curiae* status in this proceeding.

various operations which, in addition to film and battery replacement, were required to produce a functional and marketable camera. The processing included repair to the camera case to exclude light following the film reloading operation, repackaging, and relabeling under Jazz's trademark. Also at issue in this case are the circumstances under which spent disposable cameras, known in the trade as "shells," were collected for use in Polytech's reloading operations.

Under Section 337, Customs is charged with enforcing the ITC's general exclusion order with respect to imported disposable cameras offered for admission into the United States. To demonstrate that the cameras in the two entries at bar are entitled to admission under the ITC's general exclusion order, Jazz must establish that the shells used by Polytech to produce the reloaded cameras resulted from disposable cameras that had undergone a patent-exhausting "first sale" in the United States. To be "patent-exhausting," the sale in the United States must be made under the authority of Fuji or one of its licensees. Jazz also must demonstrate that the processing Polytech performed to reload the cameras was a "permissible repair" of the original camera as opposed to a "prohibited reconstruction." Both of these requirements stem from the decision of the U.S. Court of Appeals for the Federal Circuit in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed. Cir. 2001), *cert. denied*, 536 U.S. 950 (2002). There, the Court of Appeals, in reviewing the underlying general exclusion order, reversed the ITC's judgment of patent infringement regarding LFFPs for which the patent rights were exhausted by first sale in the United States, and that were permissibly repaired. *Id.* at 1110.

The court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a) (2000). The court set an expedited trial schedule with the consent of both parties.[2] At a four-day bench trial held October 12-14 and October 18, 2004, plaintiff produced evidence establishing permissible repair for all of the cameras in the two entries. Plaintiff produced evidence sufficient to establish "first sale" for only some of the subject cameras, as identified further in this opinion. Defendant United States presented no case in chief and instead relied principally on its cross-examination of the two witnesses called by Jazz at trial, and on its interpretation of the "first sale" requirement as addressed by the Court of Appeals for the Federal Circuit, to support its contention that Jazz failed to meet its burden of proof as to any camera offered for admission.

The court concludes, based on the record made in these proceedings, that only the aforementioned cameras for which plaintiff produced evidence sufficient to establish "first sale" in the United States qualify for admission, and only to the extent that the court has identified those specific cameras as capable of being segregated from the remaining cameras in the two shipments. The court concludes that those remaining cameras are required to be exported or otherwise disposed of according to applicable customs laws.

---

[2] By the time Customs excluded the merchandise, plaintiff already had commenced an action in this court, Court No. 04-00442, claiming jurisdiction under 28 U.S.C. § 1581(I) and seeking expedited relief. That action addressed six entries of Jazz disposable cameras, including the two at issue herein. After Customs, on September 29, 2004, denied plaintiff's protest of the decision to exclude those two entries, plaintiff initiated this case, filing its complaint on October 4, 2004. Pursuant to the expedited trial schedule, the parties conducted an accelerated discovery process, during which defendant took depositions of the two witnesses who testified at trial.

I. Background

This litigation did not arise in isolation. Its roots are in other proceedings in which Fuji claimed that Jazz's business activities involving single use cameras infringed its patent rights.

In the 1999 Section 337 action mentioned above, Fuji charged that 27 respondents, including Jazz, were infringing fifteen of Fuji's patents. The ITC found infringement on the part of 26 respondents, including Jazz, and on June 2, 1999 issued its General Exclusion Order and Order to Cease and Desist ("Exclusion Order") that, *inter alia*, prohibited the importation into the United States of "Certain Lens-Fitted Film Packages." The Court of Appeals for the Federal Circuit stayed the Exclusion Order pending appeal. *See Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d at 1098. The Court of Appeals affirmed the Commission's orders; however, it provided for one exception to the Exclusion Order, holding that "[t]he [ITC's] judgment of patent infringement is reversed with respect to LFFPs for which the patent right was exhausted by first sale in the United States, and that were permissibly repaired." *Id.* at 1110.

In addressing the questions of first sale and permissible repair, the Court of Appeals for the Federal Circuit stated the general rule that "patented articles when sold 'become the private individual property of the purchasers, and are no longer specifically protected by the patent laws.'" *Id.* at 1102 *(quoting Mitchell v. Hawley*, 83 U.S. (16 Wall) 544, 548 (1872)). "The purchaser of a patented article has the rights of any owner of personal property, including the right to use it, repair it, modify it, discard it, or resell it, subject only to overriding conditions of the sale." *Id.* The Court then addressed

two specific questions arising from the application of this general principle of patent law to the single use cameras imported by Jazz. First, it addressed what "repair" of a single use camera is permissible under the patent laws. Second, it defined what type of sale is "patent-exhausting," *i.e.*, the Court resolved the issue of the type of sale needed for the purchaser to obtain the full scope of rights, including the right to repair as well as the right to use and resell, that will attach only when an article no longer has patent protection.

The Court of Appeals analyzed in detail the distinction patent law draws between "permissible repair" and "prohibited reconstruction." The Court specified that an eight-step process undertaken by Jazz would qualify for permissible repair, as follows: (1) removing the cardboard cover; (2) opening the body of the shell (usually by cutting at least one weld); (3) replacing the winding wheel or modifying the film cartridge to be inserted; (4) resetting the film counter; (5) replacing the battery in a camera equipped with a flash; (6) winding new film out of a cannister onto a spool or into a roll; (7) resealing the camera body using tape and/or glue; and (8) applying a new cardboard cover. *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d at 1101.

Regarding the "first sale" issue, the Court of Appeals for the Federal Circuit, settling a previously open question of patent law, held that

> [t]o invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent. Our decision applies only to LFFPs for which the United States patent rights have been exhausted by first sale in the United States. Imported LFFPs of solely foreign provenance are not immunized from infringement of United States patents by the nature of their refurbishment.

*Id.* at 1105 (citation and parenthetical omitted).

While Jazz's appeal of the ITC Exclusion Order was pending, Fuji filed a second action with the ITC seeking "institution of a formal enforcement proceeding to enforce the exclusion and cease and desist orders, which [were] issued on June 2, 1999, impos[ition of] civil penalties, and impos[ition of] such other remedies and sanctions as are appropriate against Jazz and several other entities." *ITC Enforcement Initial Determination*, USITC Inv. No. 337-TA-406 (Apr. 6, 2004). The ITC administrative law judge found that Jazz had violated the Exclusion Order with respect to some of its product imported from various facilities in the People's Republic of China ("China"). *See ITC Enforcement Initial Determination* at 149. The ITC Enforcement Initial Determination effectively became the determination of the Commission when the ITC issued a notice declining to review the Enforcement Initial Determination on July 27, 2004. *Determination Not To Review the Presiding Administrative Law Judge's Enforcement Initial Determination and Request for Briefing on Recommended Enforcement Measures on Certain Lens-Fitted Film Packages*, 69 Fed. Reg. 46,179 (Aug. 2, 2004).

In addition to the actions it had brought before the ITC, Fuji sued Jazz for patent infringement in the U.S. District Court for New Jersey. *See Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434 (D. N.J. 2003). The District Court, after a jury trial, found Jazz "liable for infringement of Fuji's patents with respect to 40,928,185 cameras sold by Jazz during the period 1995 through August 21, 2001." *Id.* at 459. The District Court set damages owed by Jazz at $22,919,783.60. The Court also found Jazz's president personally liable for inducement of infringement with respect to 39,103,664 of

the cameras, and held him jointly and severally liable for an amount of $21,898,051.84. *Id.* at 459-60. The District Court judgment apparently contributed to a decision by Jazz to seek protection under chapter 11 of Title 11, United States Code.

Jazz is now the subject of ongoing bankruptcy proceedings in the Bankruptcy Court for the District of New Jersey. On August 2, 2004, Fuji, a creditor participating in those proceedings, filed a motion to convert the proceedings from reorganization under chapter 11, to liquidation under chapter 7, of Title 11, United States Code. In this Court, Jazz has argued that it will have no means of staying in business and avoiding bankruptcy under chapter 7 should it be unsuccessful in obtaining the immediate release of its merchandise.

## II. SUMMARY OF CONTENTIONS OF THE PARTIES

In its argument before this Court, Jazz submits that the subject imported merchandise reflects modifications Jazz made in its business operations to correct the circumstances that caused the ITC and the District Court for New Jersey to conclude that certain previous imports of Jazz's disposable cameras infringed Fuji's patents. By way of background, the ITC considered, and found infringing, reloaded LFFPs imported and sold by Jazz that fall into four categories: (1) cameras refurbished using shells that had been collected outside the United States; (2) cameras that had been refurbished more than once (so-called "reloaded reloads"); (3) Kodak cameras which, when undergoing the refurbishing process abroad, had been fitted with a full-width replacement back for the camera case that was not produced by Fuji or a Fuji licensee and that infringed a Fuji

patent; and (4) cameras for which Jazz was unable to show evidence that the refurbishing constituted "permissible repair."

Jazz maintains that it has established, by a preponderance of the evidence, that the cameras in the two entries at issue were refurbished only from shells collected in the United States, that in sorting the shells the supplier of the refurbished cameras, Polytech, excluded from processing shells that were previously reloaded, that Polytech did not use any full-width replacement backs in making the subject merchandise, and that the refurbishing process conformed to the standard of "permissible repair." Defendant United States asserts generally that Jazz has failed to meet its burden of proof for either "first sale" or "permissible repair." The United States further argues that this Court, in the event it orders the release of any merchandise, should grant no expedited relief to Jazz, disputing plaintiff's contentions about Jazz's precarious financial status.

### III. APPLICABLE LEGAL STANDARDS

The court reviews *de novo* the protested decision by Customs to exclude the subject merchandise. *See* 28 U.S.C. § 2640(a)(1). For purposes of this review, the factual determinations by Customs are presumed to be correct. 28 U.S.C. § 2639(a)(1). To overcome this presumption, Jazz must establish, by a preponderance of the evidence, that the single use cameras qualify for admission. *See St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 769 (Fed. Cir. 1993) (holding that the preponderance of the evidence standard is the adequate burden of persuasion for factual matters in post-importation cases). Under the requirements found by the Court of Appeals for the Federal Circuit in *Jazz Photo Corp. v. Int'l Trade Comm'n,* plaintiff must establish that

each individual camera offered for admission underwent a patent exhausting first sale in the United States and that the processing performed by Polytech in China was confined to "permissible repair," *i.e.*, that it did not constitute "prohibited reconstruction."

A.  The Requirement of a Patent-Exhausting "First Sale"

The court takes judicial notice that Jazz, in marketing LFFPs reloaded from the shells manufactured by or under license of Fuji, does not have access to documentary evidence, such as sales receipts, establishing the location of the original sale.[3]  This conclusion stems from the practical consideration that Jazz and similar companies must obtain shells, directly or indirectly, from the businesses that develop the film in the LFFPs.  The court takes further judicial notice that, as any consumer of a disposable camera knows from experience, if not from the label on the camera itself, the photo processor typically retains the spent shell when the consumer receives the prints or negatives.

A second practical consideration, stemming at least in part from the protracted litigation between Fuji and Jazz, is that Jazz and similarly situated companies cannot reasonably be expected to have access to information that does or may exist, and would be expected to be proprietary to Fuji and the licensees, from which the location of first sale of a shell could be ascertained to a certainty.  In order for the "permissible repair" exception identified and delineated by the Court of Appeals for the Federal Circuit in

---

[3] The court's judicial notice is informed by consideration of this question by another court.  The District Court for New Jersey has rejected the view that "first sale" must be established with direct evidence of the first sale such as a sales receipt.  *See Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*, 249 F. Supp. 2d at 451-52.

*Jazz Photo Corp. v. Int'l Trade Comm'n* to have any practical meaning in commerce, Jazz must be permitted to conduct its business such that "first sale" may be established on the basis of evidence that is commercially available to it.

As a threshold consideration, the court is unable to presume that a shell collected from any source in the United States, and not previously reloaded, resulted from a single use camera that underwent a patent-exhausting first sale in the United States. The court finds no support in the Federal Circuit's opinion in *Jazz Photo Corp. v. Int'l Trade Comm'n*, or in the Exclusion Order, for such a general presumption. Rather, the court concludes from these sources of law that Jazz must meet its evidentiary burden through factual evidence establishing first sale that goes beyond the mere fact that the shells were obtained in the United States.

However, Jazz argues, and the court agrees, that Jazz should be entitled to rely on a "presumption of regularity" under which Customs must be presumed to be enforcing the Exclusion Order. Under such a presumption, any new single use cameras identified by the Exclusion Order that are commercially imported by anyone other than Fuji or one of its licensees would be unlawful imports and presumed to be excluded from the U.S. market.[4] Because the Exclusion Order contains an exception allowing noncommercial

---

[4] In a recent decision, the Court of Appeals for the Federal Circuit rejected an argument by Fuji that this presumption of regularity is unwarranted. *See Fuji Photo Film Co., Ltd, v. Int'l Trade Comm'n*, 386 F.3d 1095, 1107 (Fed. Cir. 2004) ("To the extent that Fuji's argument is directed at a perceived lack of resources or competence on the part of the Customs Service, we cannot address that problem through a judicial directive that would, in effect, require the Commission to alter its practices based on our unsupported suspicion that the Customs Service is incapable of performing the duties Congress has assigned to it.").

("personal use") importations, this presumption does not extend to the LFFPs, which may be called "tourist" cameras, that are imported under that exception. The court addresses below the legal issues posed by previously-reloaded shells and by noncommercial importations. Following this discussion, the court addresses the remaining legal issues posed by the facts in this case as they pertain to the circumstances under which the shells used to produce Jazz's imported cameras were collected.

### 1. The "Reloaded Reload" Issue

In this proceeding, Jazz acknowledges that a shell from a "reloaded" camera, as opposed to a new camera, is not entitled to a presumption of patent-exhausting first sale, as such a shell could have resulted from a single use camera previously imported and found to have infringed Fuji's patents. Instead, Jazz points to record evidence of a sorting operation conducted on the shells prior to the processing that refurbishes them with new film and, where applicable, flash batteries. That sorting operation, according to Jazz, reliably excludes from processing shells from reloaded cameras, based on physical indications of the previous reloading, such as the presence of black tape, the presence of replacement parts, or the absence of an original label of Fuji or one of its licensees. As discussed later in this opinion, Jazz at trial met its burden of establishing that its operations satisfactorily addressed the "reloaded reload" issue.

### 2. The "Tourist Camera" Issue

In these proceedings, the parties devoted considerable argument to the issue of shells from what may be called "tourist cameras." Jazz acknowledges, as a general matter, that some shells collected in the United States, even though processed by a film

developer in the United States, may nevertheless have been first sold abroad. Such a shell would result, for example, if a U.S. tourist purchased and used a disposable camera in a foreign country and brought it back to the United States for developing of the film. The camera in its original condition could have been imported lawfully under the personal use exception in the Exclusion Order. The parties disagree on whether the resulting shell, if exported and permissibly repaired, would qualify for admission to the United States under the Exclusion Order. Jazz maintains that such a camera would be deemed under patent law principles not to violate the Exclusion Order. Jazz argues in the alternative that if the court should find to the contrary, it nevertheless should conclude that Jazz has met its evidentiary burden by presenting evidence that the sorting operation conducted on the shells prior to the processing, mentioned above, also is sufficiently reliable to exclude shells that contain labeling in a foreign language or are otherwise identifiable as being of models of LFFPs not typical of those found in the United States market.

The aforementioned "personal use," or "tourist camera," exception, set forth in paragraph four of the Exclusion Order, provides that the LFFPs

> are entitled to entry for consumption into the United States, without payment of bond, if upon importation they accompany a person arriving in the United States and are for the arriving person's personal use, or which are otherwise imported into the United States in such small quantities and under such circumstances so as to reasonably indicate to the satisfaction of the U.S. Customs Service that they are being imported for personal use rather than for commercial purposes.

The Exclusion Order was issued before the Court of Appeals for the Federal Circuit, in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, held that permissibly

repaired LFFPs that underwent a patent-exhausting first sale constitute an exception to its general finding that the imported LFFPs at issue infringed Fuji's patent rights. Under the clear holding of the Court of Appeals, a LFFP must undergo a patent-exhausting first sale in the United States to qualify for permissible repair. It is just as clear that LFFPs brought in under the "tourist" exception in paragraph four of the Exclusion Order do not meet this test. These two conclusions, however, do not resolve entirely the legal question posed by the factual situation of disposable cameras offered for importation into the United States after being refurbished abroad using "tourist shells" collected from U.S. photo processors, a situation not addressed anywhere in the Exclusion Order. Nor does the legal question posed by such cameras appear to have been before the Court of Appeals in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094.

This court concludes that, in resolving the dispute between the parties in this case, it need not decide the issue of whether shells from "tourist cameras," in all circumstances and as a matter of law, may be exported from the United States, refurbished, and re-imported lawfully under the Exclusion Order. That conclusion is grounded in the particular findings of fact identified later in this opinion. The court notes, in particular, the absence of any record evidence from which it could conclude that a camera made from a "tourist" shell actually is present in either of the entries of merchandise at issue. As also discussed later in this opinion, the only evidence of record bearing on the question of the likelihood of the presence of tourist shells among collections of shells obtained from photo processors in the United States supports a finding of fact that tourist shells may be present at a percentage that is "very small, much less than one percent."

A third group of findings relevant to the tourist camera question pertain to the evidence of sorting conducted by Polytech, Jazz's Chinese supplier of refurbished cameras. Under the particular factual circumstances that plaintiff, by a preponderance of the evidence, established to exist in this case for a portion of the cameras offered for importation, the "first sale" requirement has been met.

Because it would have simplified the issues presented by this case were the court able to accept plaintiff's arguments that cameras refurbished from tourist camera shells collected from U.S. photo processors may lawfully be entered for consumption, it is helpful to address the arguments and the reasons why the court concludes that plaintiff's arguments do not suffice. As a threshold consideration, the court notes that the questions of law properly before it concern the enforcement by Customs of the Exclusion Order as modified by the Court of Appeals. It is not the role of this Court or of Customs to settle questions of intellectual property law. *See K Mart Corp. v. Cartier, Inc.,* 485 U.S. 176, 189 (1988). Thus, it is not within the power of this Court in the first instance to determine whether, as a matter of patent law, Fuji's patent rights in tourist cameras or shells of tourist cameras have been extinguished under some principle distinct from the exhaustion by "first sale" principle or any other patent law principle unrelated to the application of the Exclusion Order. As a result, defenses to infringement that Jazz could have asserted before the ITC in the Section 337 proceeding, and thereafter raised on appeal before the Federal Circuit, will not be availing in this forum. That still leaves for this court's consideration, however, the arguments advanced by plaintiff that stem from the personal use exception itself or from the ITC's Section 337 proceeding and Jazz's

subsequent appeal of the ITC's decisions affecting its imports in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094.

Plaintiff's first argument is that the Exclusion Order, by explicitly creating the exception for personal use imports, implicitly approves of the use of tourist cameras for any purpose including repair and re-importation. The court finds no basis to conclude that the Exclusion Order, by excepting from the import exclusion the importation of cameras for personal use, had any legal effect beyond the express terms of paragraph four therein. Section 337 proceedings are based in patent law; however, they are not identical to patent law. A decision by Customs to enforce or not enforce the full scope of the patent holder's rights to control the sale, use and manufacture of the merchandise in question does not affect other rights held by the patent holder. *See Corning Glass Works v. U.S. Int'l Trade Comm'n*, 799 F.2d 1559, 1571-72 (Fed. Cir. 1986) (noting that ITC decision not to issue an exclusion order does not sanction the infringement of U.S. patents by importers). On its face, the exception to the Exclusion Order applies only to those cameras being imported for personal use. When a refurbished camera is imported for commercial purposes, the exception does not apply. To qualify for entry for consumption in the Customs territory, a disposable camera must comply with the Exclusion Order as a whole.

Jazz's second argument is that Fuji gave an implied license of its patent rights by not seeking an import exclusion for tourist cameras in the Section 337 proceeding. Patent law, however, does recognize the possibility of an implied license. *See De Forest Radio Tel. Co. v. United States*, 273 U.S. 236 (1927). The common thread of implied

license claims is equitable estoppel. "Thus, an implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party." *H.M. Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559 (Fed. Cir. 1983). There is no evidence in the record that Fuji took any action, upon which Jazz reasonably could have relied, that implied a waiver of Fuji's rights. Decisions as to the scope of the enforcement of an exclusion order are within the purview of Customs and the ITC. Typically, an implied license is found by determining "what the parties reasonably intended as to the scope of the implied license based on the circumstances of the sale." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995). In this instance, there was no sale from Fuji to Jazz to examine. The sale of the camera to a customer by the patent holder or a licensee does not create an implied license that a third party can rely upon when that sale occurs in a foreign country. *See Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d at 1105.

Third, and related to the second theory, plaintiff maintains that the ITC and Customs, by not enforcing Fuji's rights through an exclusion of the tourist cameras, has created a waiver of those rights. If the relationship between Fuji and Jazz is not sufficient grounds to establish an implied license, then actions by a third party, Customs in this case, cannot impose on a patent holder a waiver of patent rights. Customs and the ITC can exercise their discretion not to use their powers to enforce those rights, but that does not waive Fuji's ability to pursue those rights in other fora. *See Corning Glass Works*, 799 F.2d at 1571-72. The court finds no legal authority allowing it to conclude

that either the Exclusion Order by itself, or actions by Customs to permit importation of LFFPs for personal use, established an implied waiver of Fuji's patent rights.

Fourth, Jazz maintains that by failing to bring any action under domestic patent law that would seek to prevent the use or sale of the personal use cameras while they are in the United States, Fuji has abandoned any right to object to Jazz's subsequent action relying on the legal collection of the shells in the United States. The parties apparently disagree as to whether Fuji could bring an action under the patent laws to prevent the use by consumers of the personal use LFFPs imported under paragraph four of the Exclusion Order; both parties agree that Fuji has not done so. Plaintiff's contention essentially is that if, *arguendo*, Fuji could bring such an action or an action to enjoin photo processors from selling spent tourist shells, its failure to do so has constituted a waiver of those rights. However, the court finds no legal authority under which it could conclude that Fuji's failure to take either of these steps creates any such waiver.

The remaining arguments Jazz advances on the tourist camera issue pertain to its contention that any cameras refurbished from tourist camera shells would exist, if at all, only in *de minimis* quantities. Actions arising under section 337 do include an implicit *de minimis* exception. This stands in contrast to traditional patent law, which holds that any infringing product creates a cause of action. Under section 337, only those imports which cause substantial injury will prompt the ITC to issue an exclusion order. *See Corning Glass Works*, 799 F.2d at 1567 ("[T]o accept proof of a conceivable or actual loss of sales or profits of any amount by the patentee as sufficient proof of an effect or tendency to substantially injure the domestic industry would eliminate the 'independent

proof' of the 'distinct injury requirement' held to be necessary in [*Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d 1019, 1028-29 (Fed. Cir. 1985)]."). It is therefore possible that the ITC could amend its Exclusion Order expressly to permit re-importation of the tourist cameras, finding that they do not create a substantial injury. However, that determination is within the power of the ITC, and not within the jurisdiction of this Court. The issue before this court is confined to the exercise by Customs of its authority to enforce the Exclusion Order as it applies to the subject single use cameras. To incorporate a *de minimis* exception into the Exclusion Order, Jazz must present its argument before the ITC, with any appeal therefrom brought in the Court of Appeals for the Federal Circuit.

Nevertheless, as noted earlier, there is no record evidence from which the court may conclude that the subject merchandise actually includes cameras refurbished from tourist shells. That, and the findings concerning the relative rarity of tourist shells, and concerning the sorting conducted to remove from processing those tourist shells presenting indications allowing them to be identified, are satisfactory to resolve the tourist camera issue as it is presented by the record evidence in this case.

Defendant United States made much of the possibility that some tourist cameras may be labeled in English because they were intended for sale in various English-speaking foreign countries, and of the likelihood that such shells could be selected for processing during the sorting procedure described at trial. Under defendant's argument, Jazz would be expected to arrange for foolproof sorting of shells based on information known to Fuji and its licensees, which information Jazz likely could not obtain. The

court declines to disallow the entire "permissible use" exception, which the Court of Appeals conditioned on first sale in the United States, on the theoretical possibility that the entries at issue contain one or more cameras made from shells of tourist cameras collected in the United States. Were the court to impose a blanket prohibition upon such a theoretical possibility, it would be acting contrary to the intent the Court of Appeals demonstrated by going to the lengths it did to apply the permissible repair doctrine to the specific class of merchandise at issue in this case.

### 3.  Collection of Shells in the United States

In the ITC enforcement proceeding, the administrative law judge concluded that forty percent of the LFPPs Jazz imported in the time period August 21, 2001 to December 12, 2003 were refurbished from shells of LFPPs for which the first sale occurred outside the United States. [



.] *ITC Enforcement Initial Determination* at 43.  Without specifying an exact percentage, the judge made a finding, based on an admission by Jazz, that "the primary source of foreign shells among samples of empty Jazz shells is the reloaded reloads." *ITC Enforcement Initial Determination* at 65.

Before the administrative law judge, Jazz contended that there was no practical means to differentiate between a shell sold abroad and one sold in the United States using nonproprietary information. *ITC Enforcement Initial Determination* at 35.  The administrative law judge disagreed with Jazz, finding that with regard to Fuji, Kodak, and

Konica, the language in which the package label is presented is an indication of the country in which the original manufacturer intended the LFFP to be sold. *ITC Enforcement Initial Determination* at 35. The administrative law judge observed that prior to the August 21, 2001 decision of the Court of Appeals in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, Jazz relied on foreign collection of shells for ninety percent of its refurbished LFFPs. These previously reloaded foreign shells were found not to have been screened by Jazz from its shells collected in the United States, and they were found to have been the primary source of the LFFPs refurbished from foreign shells that were found in the sample of Jazz's LFFPs in the enforcement proceeding.

Before this court, Jazz argued that if it were to sort out from shells collected in the United States the two known sources of shells resulting from infringing LFFPs, *i.e.*, shells labeled in a foreign language and shells previously reloaded, then a presumption arises that the remaining shells were subject to a patent-exhausting first sale in the United States. The court disagrees.

A sorting process that removes foreign-language shells and previously reloaded shells, standing by itself, is not sufficient to establish first sale. Plaintiff did not make or attempt to make an evidentiary showing that LFFPs by the four original manufacturers (Fuji, Kodak, Konica and Concord) labeled in English are not sold in foreign countries. Therefore, the court does not have facts on the record supporting a finding that sorting is a foolproof method of identifying and sorting out shells from cameras first sold abroad. As counsel for the United States argued, sorting that excludes foreign-language shells cannot identify shells that may have been sold abroad in an English-speaking country.

Such shells could be imported into the domestic market and then sold to a company that refurbishes LFFPs. As plaintiff itself acknowledged during its closing argument at trial, shells may be imported into the United States without violating the Exclusion Order, which according to plaintiff does not apply to "Lens-Fitted Film Packages" that are not fitted with film. According to the ITC administrative law judge, there is a significant international market in used shells. *ITC Enforcement Initial Determination* at 65. The court infers from the existence of this market, and from the absence of a prohibition on the importation of shells into the United States, that a collection of shells obtained in the United States, from which previously reloaded shells and foreign-labeled shells have been removed, would not necessarily satisfy the first sale requirement. The court concludes, in the particular context of the facts established in this case, as set forth later in this opinion, that additional evidence is necessary to establish compliance with the first sale requirement. As discussed in detail in the Findings of Fact portion of this opinion, Jazz was able to demonstrate, for some but not all of its LFFPs in the two entries, that the shells used by Polytech in the refurbishing process not only were collected in the United States, but were collected, directly or indirectly, from entities engaged in the particular business of photo processing.

Collection from a photo processor located in the United States, combined with a system to sort out shells that previously were reloaded, would address the possible sources of shells from LFFPs first sold abroad, except for shells from LFFPs that entered the United States in violation of the Exclusion Order or entered the United States under the personal use exception in the Exclusion Order. As to the former, Jazz may rely on

the aforementioned presumption of regularity that Customs is enforcing the clear terms of the Exclusion Order and preventing importation of infringing LFFPs sold outside the United States. *See Fuji Photo Co., Ltd. v. Int'l Trade Comm'n*, 386 F.3d 1095, 1107 (Fed. Cir. 2004). Concerning the latter, the "tourist camera" shells, sorting of shells so that those with original labels in a foreign language, or those with other indications that would reveal, based on nonproprietary information, that they are of a type not sold in the U.S. market, are not selected for processing is a practical means to remove "tourist camera" shells from the mix of collected shells.

Thus, shells collected, directly or indirectly, from a photo processor in the United States are far more reliable, from the standpoint of showing "first sale," than those that are shown to have been collected in the United States but that have no evidence linking them to a source in the United States that actually is in the photo processing business. It is theoretically possible that a U.S. photo processor could engage in the additional business of "international shell arbitrage," *i.e.*, importing shells from abroad for resale to shell collectors or reloaders. The court, however, finds this hypothetical to be highly speculative. Defendant placed no evidence on the record in this proceeding to establish that such a scenario actually exists.

### B. The Requirement of "Permissible Repair"

Polytech's camera refurbishing operations in China must comply with the requirement of "permissible repair," *i.e.*, the processing must not constitute "prohibited reconstruction." *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d at 1101. The Court of Appeals for the Federal Circuit identified, as permissible repair, the previously-

mentioned eight-step process, which includes: (1) removing the cardboard cover; (2) opening the body of the shell (usually by cutting at least one weld); (3) replacing the winding wheel or modifying the film cartridge to be inserted; (4) resetting the film counter; (5) replacing the battery in a camera equipped with a flash; (6) winding new film out of a cannister onto a spool or into a roll; (7) resealing the camera body using tape and/or glue; and (8) applying a new cardboard cover.

In the proceedings in U.S. District Court for New Jersey, the permissible repair standard set forth by the Federal Circuit was further elucidated. The District Court identified a series of nineteen permissible steps that included operations incidental to the eight steps identified by the Court of Appeals. However, the District Court did not conclude that the nineteen steps it identified were exhaustive. The Court held that

> under the Federal Circuit's formulation in *Jazz v. ITC*, when a camera is opened, film is properly inserted, the battery is replaced, and the camera is closed, the camera has been permissibly repaired. These four permissible processes serve the function of preserving the remaining useful life of the camera as a whole.

*Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*, 249 F. Supp. 2d at 445-46. The District Court further noted:

> Whether these refurbishment procedures are counted as four, eight or nineteen "steps" is a matter of semantics, as virtually any step can be divided into multiple "sub-steps." The legal issue is whether the totality of the refurbishment procedures are of such a nature that they preserve the useful life of the patented article, or whether they in fact recreate the article after it has become spent.

*Id.* at 446-47.

This court agrees with the District Court's analysis, noting that the opinion of the Court of Appeals for the Federal Circuit is not properly interpreted to disallow minor

processing incidental to the eight steps identified in the Court's opinion in *Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094.

## IV. FINDINGS OF FACT ON FIRST SALE AND PERMISSIBLE REPAIR

At trial, Jazz produced two witnesses who testified on various factual matters relevant to the first sale and permissible repair issues. Jazz also introduced a large number of documents, almost all of which documents the court found admissible and, accordingly, admitted to the record. Defendant United States declined to put on a case in chief, instead relying largely on its cross-examination of plaintiff's two witnesses to support its contention that Jazz had failed to show that all the cameras at issue satisfied the first sale and permissible repair requirements. As a result, the critical evidence introduced by the plaintiff at trial in this case is unrebutted.

The court, after considering whether plaintiff has met its burden of proof by a preponderance of the evidence on each of the various factual issues in this case, has made individual findings of fact on the following core issues: (A) Whether Jazz has established a patent-exhausting first sale for any or all of the cameras at bar, based on the circumstances under which the shells used in processing were collected; and (B) Whether Jazz has established that Polytech's camera refurbishing operations qualify as "permissible repair" for any or all of those cameras. These core findings of fact, and certain related factual findings, are set forth in this section of the opinion.

The findings of fact reached by the court on issue (A), *i.e.*, "first sale," required the court to make findings of fact on a third issue. That issue is whether Jazz has demonstrated, by a preponderance of the evidence, that cameras refurbished from a group

of shells obtained from a company known as Seven Buck's, Inc. can be segregated from the remaining cameras in the two shipments. A fourth factual issue pertains to a determination under USCIT R. 62 governing any stay affecting the time at which this court's judgment may be enforced. The findings of fact and conclusions of law pertaining to these two additional issues are set forth in subsequent sections of this opinion.

A. Findings of Fact Relevant to the Issue of First Sale in the United States

Plaintiff established at trial that the LFFPs in the two shipments at bar were refurbished in China by Polytech. Plaintiff also established that a portion of these LFFPs were refurbished by Polytech using shells that Polytech obtained from a collector of shells, Photo Recycling Enterprises, Inc. ("Photo Recycling"), a company headquartered in Piscataway, New Jersey. Plaintiff established that the remainder of the LFFPs at issue were refurbished by Polytech in China using shells that Jazz provided to Polytech after acquiring them from the company known as Seven Buck's, Inc. ("Seven Buck's"), which operated in Newport Beach, California.

The court further finds, based on the records of plaintiff admitted into evidence and the testimony of the two witnesses at trial, that the LFFPs made from shells acquired from Seven Buck's were identified separately in plaintiff's inventory control system, which assigned to these LFFPs a "Master Lot Number" ("MLN"), and that they were identified in that inventory control system by Master Lot Number 463. The court further finds, based on plaintiff's records and the testimony of the two witnesses at trial, that plaintiff's inventory control system assigned Master Lot Numbers other than Master Lot

Number 463 to the LFFPs in the two subject shipments that resulted from Polytech's refurbishing of shells acquired from Photo Recycling. The evidence establishes, as discussed later in this opinion, that the inventory control system using Master Lot Numbers enables finished LFFPs to be identified by Master Lot Number according to the shipments of shells from which they were refurbished by Polytech.

Based on a preponderance of the evidence presented at trial, the court finds as a fact that all the shells acquired from Photo Recycling that were used in refurbishing LFFPs in the two subject shipments were acquired, directly or indirectly, from entities that performed photo processing operations in the United States. With respect to any of the aforementioned shells that Polytech acquired from collectors of shells, instead of from U.S. photo processors, the court finds, based on a preponderance of the evidence, that a condition of the purchase of such shells was collection from photo processors in the United States.

The evidence supporting the aforementioned findings of fact and other findings of fact relevant to the issue of first sale is summarized below.

### 1. Findings of Fact Established by the Testimony of Mr. Leon Silvera

Jazz introduced at trial the testimony of Mr. Leon Silvera, President of Photo Recycling. The court found his testimony credible based on his demeanor, demonstrated knowledge of Photo Recycling's business activities, and general knowledge of the business of collecting spent shells. His testimony established, by a preponderance of the evidence, the following facts.

1. Photo Recycling is in the business of collecting spent shells from three distinct types of vendors. These vendors include (1) national retailers that operate internal photo processing labs (*e.g.*, CVS and COSTCO), (2) independent photo processors or small, wholesale photo finishing labs, and (3) entities that are in the business of collecting shells, otherwise known as shell collectors. Tr. 184-86.

2. Photo Recycling contracts a price for shells with individual vendors and sends each pre-paid, domestic UPS labels and cartons that most suppliers use to ship shells to Photo Recycling's warehouse in Piscataway, New Jersey. Tr. 188-89.

3. Approximately 80% of the shells collected by Photo Recycling in the United States in 2004 were obtained from the national retailers referred to in paragraph 1, above. Tr. 187.

4. Approximately 10% to 15% of the shells collected by Photo Recycling in the United States in 2004 were obtained from independent photo processors or small, wholesale photo finishing labs. Tr. 187.

5. According to Mr. Silvera, based on his knowledge of the industry, 85% of disposable cameras developed at photo processing locations are likely purchased from that same location. Tr. 316-17.

6. The remaining 10% to 12% of the shells collected by Photo Recycling in the United States in 2004 were obtained from shell collectors. Tr. 187.

7. Photo Recycling contracts to buy from the third type of vendor, *i.e.*, shell collectors, only shells with original Kodak, Fuji, Konica or Concord packaging identifying the manufacturer. Tr. 192, 341.

8.  Photo Recycling requires that shipments it purchases from shell collectors be accompanied with letter certifications indicating that the shells in the cartons were collected from photo processors in the United States. Tr. 303-04, 354-55.

9.  Photo Recycling collects in excess of one million shells per month from approximately 5,000 different vendors. Tr. 314, 321.

10. Photo Recycling sells and ships at least 90% of all the shells it collects to Polytech in China. Tr. 193, 218.

11. Between the summer of 2001 and the winter of 2003, Photo Recycling sorted all the shells it collected. Tr. 319, 326. Photo Recycling did not sort for tourist shells until the latter stages of this sorting program. Tr. 326. Tourist shells, with clearly identifying foreign markings and foreign language, comprised "way less than 1%" of the total shells collected during that time. Tr. 323. This percentage is based on Photo Recycling's sorting experience gained from the sorting of "probably in excess of 10 million shells." Tr. 323.

12. Photo Recycling no longer performs complete sorts of the shells it collects. Instead, Photo Recycling performs sample sorts of approximately 5% of the total shells it receives from all its vendors. Tr. 301-02, 320.

13. Photo Recycling's sample sorting system focuses primarily on identifying shells that came from disposable cameras first sold in the United States by sorting for shells with original labeling and those with foreign markings. Tr. 326-28. During sample sorts, shipments from collectors are, on rare occasion, completely sorted.

Tr. 329. A complete sort of a shipment occurs only when a variance involving previously reloaded or foreign-labeled shells is detected. Tr. 301-02, 329, 357.

14. In Mr. Silvera's opinion, if there were an inordinately high number of tourist shells in the mix of shells sent to Polytech, Polytech would report that to Photo Recycling as being some aberration, which Polytech and Photo Recycling then would discuss. Photo Recycling has not had that reporting from Polytech. Tr. 323-24.

15. In Mr. Silvera's opinion, payments received by Photo Recycling from Polytech and the reports generated by Polytech indicate that Photo Recycling does not sell Polytech a significant number of tourist shells. Tr. 332.

16. Photo Recycling's sample sorting system also screens for shells with black tape and other signs indicating shells that previously were reloaded. Tr. 328. Photo Recycling depends upon reports from Polytech to ensure that a shipment of Photo Recycling shells does not contain a high percentage of reloaded shells. Tr. 357.

17. Photo Recycling also collects shells from countries other than the United States, but these shells are shipped directly to Hong Kong from those countries instead of being shipped to Photo Recycling in New Jersey. Tr. 308.

18. In Mr. Silvera's opinion, a "very tiny" number or *de minimis* amount of tourist shells that were first sold in English-speaking countries, such as Ireland, Australia or the United Kingdom, could possibly have been among the shells Photo Recycling collected in 2004 from photo processors in the United States. Tr. 308, 317-18.

19. In Mr. Silvera's opinion, a "very tiny" number or *de minimis* amount of tourist shells with foreign-language wrappers or bilingual wrappers could possibly have been among the shells Photo Recycling collected in 2004 from photo processors in the United States. Tr. 316-19.

### 2. Findings of Fact Established by the Testimony of Mr. Michal Zawodny

During trial, Jazz also introduced the testimony of its quality manager, Mr. Michal Zawodny, who oversees the production quality of all Jazz disposable cameras and is responsible for overseeing the procedures that the Polytech factory in China uses to produce Jazz cameras. The court found his testimony credible, based on his demeanor, his demonstrated knowledge of Polytech's sorting and processing operations, and the precision with which he responded during direct testimony and cross-examination. His testimony, some of which was aided by viewing the footage of two videotapes filmed in 2003 of Polytech's facility, and admitted into evidence, established, by a preponderance of the evidence, the following facts.

20. The Polytech facility occupies several floors in an industrial building in Shenzhen City. Shells sent to the Polytech facility are stored, sorted, refurbished and packaged on different floors. Tr. 395.

21. The sorting operation begins with Polytech sorters "dumping" shells from individual shipping boxes, previously part of a larger container, onto the sorting line. Tr. 399. Sorters then select shells for the production of Jazz cameras intended for sale in the United States. Tr. 400-01.

22.   Polytech employs between 30 and 40 sorters, and the facility sorts approximately 130,000 to 150,000 shells per day or day and a half.  Tr. 411-12, 588-90.

23.   Shipments of shells usually contain 50% to 60% Kodak brand shells, approximately 20% Fuji brand shells, 5% to 10% Konica brand shells and a relatively small percentage of Concord brand shells.  Tr. 586-87.

24.   Only Kodak, Fuji, Konica and Concord brand shells are chosen for production for the United States.  Tr. 399-400.

25.   Within the group of acceptable brands, Polytech sorters choose only shells with original wrapping or labeling produced by Kodak, Fuji, Konica and Concord, and they screen for any shells with foreign characters (*i.e.*, Japanese or Arabic).  Tr. 406, 410-11, 585-90.  Sorters will not choose shells with foreign characters for United States production.  Tr. 588-59.

26.   Questionable shells, such as shells with English lettering not typical of the United States market, are further reviewed by other Polytech staff; shells not chosen for production for the United States are sent back to the storage area and labeled as "inactive for U.S. production."  Tr. 400-01, 406, 587-88, 590.  Shells neither selected for production nor set aside as "inactive" are placed on the sorting line a second time.  Tr. 589.

27.   Although Polytech's sorters do not, for the most part, speak English, they select shells for processing by comparing the shell packaging to the packaging on sample packages.  Tr. 590.

28. In Mr. Zawodny's opinion, it may not be possible to screen out all foreign (*i.e.*, English language shells that may have been sold abroad, *e.g.*, in England) or foreign language shells (*i.e.*, shells labeled in French and English that were probably sold in Canada). Tr. 588, 590. The sorting system is based on a "certain process and certain standards." Tr. 598. In Mr. Zawodny's opinion, the sorting system is "quite accurate" and "works well." Tr. 598.

29. Polytech's sorting procedure requires that each shipment is sorted separately, so that shipments collected from foreign sources are removed from the sorting line and sorting area. Tr. 398-99.

30. Polytech sorters also screen for shells with black tape or shells that contain replacement parts. Tr. 551-52.

31. In 2004, Jazz purchased one shipment of shells from Seven Buck's Inc., in Newport Beach, California. Jazz purchased from Seven Buck's only shells with original wrappers. Mr. Zawodny witnessed the sorting of this shipment in the greater Los Angeles area, and "reviewed" the products that were made available by Seven Buck's for purchase by Jazz. Tr. 556-57; Pl.'s Ex. 19.

32. Seven Buck's workers "separated" shells in accordance with the samples provided by Mr. Zawodny and using the same standards employed by sorters at Polytech. Seven Buck's employees prepared the container for shipment to Polytech. Tr. 556-57.

The court finds, based on the testimony of Mr. Zawodny, corroborated by documentary evidence, including reports of sorting, that Polytech, during the time at

which the LFFPs at issue were processed, employed a sorting system adequate to identify and exclude from processing shells that previously were reloaded, and adequate in the context of the information commercially available, to identify and exclude from processing any shells of cameras, if present, that entered the United States under the personal use exception in the Exclusion Order.

### B. Findings of Fact Relevant to the Issue of Permissible Repair

Mr. Zawodny's testimony, some of which, as noted above, was aided by viewing the footage of two videotapes filmed in 2003 of Polytech's facility, established, by a preponderance of the evidence, the following facts.

33. Mr. Zawodny spent February, March, April, June, August, and September of 2004 in China overseeing the Polytech facility's processes of sorting shells and producing Jazz disposable cameras. Tr. 393-94.

34. Boxes containing sorted shells to be repaired for the United States market are moved to production areas of the Polytech facility. Tr. 412-14. Mr. Zawodny characterized this procedure as the first step of the repair process. Tr. 415.

35. Each shipment of shells is processed one at a time on the production lines. Tr. 415.

36. Polytech operates three production lines for daylight camera loading operations and one production line for dark loading operation (for Fuji and Konica type shells) at Polytech. Tr. 513, 540.

37. The removal of original wrapping and packaging from the shells is the next step of the process. Tr. 415.

38.     Operators stationed at production lines perform different procedures, including opening the shells, replacing advance wheels to fit the new film, removing dust and debris from the interior, replacing batteries in flash cameras, loading the film, checking the charge of the flash and resetting the counter.  Tr. 514-18.

39.     Operators close the camera with the original back covers produced by Kodak, Fuji, Konica or Concord and attach an additional molded part to cover the portion of the camera where the film is placed.  Tr. 515-16.

40.     "Full back replacement" is a term used to describe a reloaded camera with a completely new full back cover.  Tr. 607.  Shells that were repaired with full back replacements are easily identifiable by inspecting the exterior of the back cover and are not used for production of Jazz cameras intended for sale in the United States.  Tr. 607, 611.  The "full back replacement" testimony refers to refurbishing of Kodak shells.  Tr. 611.

41.     Black light-tight tape is used to seal any gaps between the seams.  Tr. 516.

42.     Jazz cameras are screened at quality control stations to ensure that the flash and trigger function properly and are ultimately packaged with new, Jazz wrappers.  Tr. 517-18, 537, 553-54.

The exhibits admitted into evidence establish that the subject LFFPs were refurbished in late July 2004.  Mr. Zawodny's testimony was aided by viewing the videotapes admitted into evidence as Segments 1 and 2 of Plaintiff's Exhibit 18.  Mr. Zawodny's testimony showed that the videotapes were filmed in 2003.  The court finds, based on Mr. Zawodny's testimony, that the processes shown in the videotapes do not

differ in a way material to the permissible repair issue, from Mr. Zawodny's description of the processes used to refurbish the subject merchandise.

The court further finds, based on Mr. Zawodny's testimony, that the processing undertaken by Polytech at the time the subject merchandise was refurbished were opening of the body of the shell, replacement of the advance wheel, replacement of the film and of the battery (if a flash camera), resetting the counter, closing and repairing the case using original parts except for the additional molded part referred to above, repackaging the refurbished camera, and various minor operations incidental to these processes. The court further finds, based on his testimony, that the aforementioned processing did not employ full-width back replacements in reloading Kodak or other shells.

C. Findings of Facts Relevant to Jazz's Inventory Control Program

1. Findings of Fact Established by the Testimony of Mr. Leon Silvera

Mr. Silvera's testimony established, by a preponderance of the evidence, the following facts.

43. Photo Recycling ships shells to Polytech via ocean freight, Tr. 252, and prepares summary information documents for each shipment, which include the vessel name, the date that the shipment sailed, where the shipment is consigned to, the quantity of cartons and shells and the total weight of shells. Tr. 225; Pl.'s Exs. 1-14 (encompassing both parts A and B).

44. Photo Recycling assigns a unique master lot number ("MLN") to every shipment sent to Polytech to identify each shipment. Tr. 251-52, 330, 381.

45.    A collector shipment receives a separate MLN only when the quantity of shells received is sufficient to fill an entire container. Tr. 358. When the quantity received is not sufficient to fill a container, then identification marks are placed on each carton of collector shells within the container, which Polytech uses to segregate collector shells for sorting purposes. Tr. 358.

The court finds, based on the testimony concerning inventory control and the documentary evidence, that the shells provided to Polytech from Photo Recycling were maintained under the Master Lot Number inventory control system.

2. Findings of Fact Established by the Testimony of Mr. Michal Zawodny

Mr. Zawodny's testimony established, by a preponderance of the evidence, the following facts.

46.    MLNs are generated by Jazz in New Jersey and relayed to Photo Recycling in New Jersey. Tr. 396-97, 459, 583-84.

47.    MLNs are used to trace shells through the sorting and production processes. Tr. 459, 548-49. They appear on most shipping documents used to transport shells from location to location. Tr. 459. All shells belonging to one MLN are stored in one location. Tr. 398.

48.    Shells selected for United States consumption by Polytech sorters are stored in large cardboard containers indicating the quantity of shells and marked with the corresponding MLN. Tr. 400.

49.    Polytech's sorting procedure requires that each MLN be sorted separately, so that

MLNs collected from foreign sources are removed from the sorting line and sorting area.  Tr. 398-99.

50.     Polytech's production procedure requires that shells in each MLN are processed on production lines one at a time.  Tr. 415.

51.     Ink dots are placed on the back of each Jazz camera produced for the United States and finished cameras are placed in boxes.  The boxes are placed on pallets that are marked with quantity, MLN, type of film used to reload, and the date the cameras were repaired.  Tr. 537, 542, 554.

The court finds, based on the testimony concerning inventory control and the documentary evidence, that the operations of Polytech involving the subject merchandise were conducted according to plaintiff's inventory control system using Master Lot Numbers.

### V.  Conclusions of Law on Permissible Repair and First Sale

Plaintiff established, by a preponderance of the evidence, that the LFFPs in the two shipments at issue in this case that were refurbished from shells provided by Photo Recycling satisfied both the permissible repair and first sale requirements.  Plaintiff did not meet its burden of proof to establish that the LFFPs refurbished from Seven Buck's shells satisfy the first sale requirement.

### A.  Plaintiff Has Established by a Preponderance of the Evidence that the Subject Merchandise Underwent Permissible Repair

Plaintiff offered unrebutted testimonial and videotape evidence from which the court concludes that the process used at the Polytech facility at the time the subject

merchandise was refurbished was in accordance with the permissible repair standard set forth by the Court of Appeals for the Federal Circuit. *See Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d at 1106-07.[5] Defendant attacked only the probative value of the evidence offered by plaintiff on permissible repair. A principal argument of defendant was that the videotapes admitted into evidence were made before the time at which the LFFPs at issue were refurbished.[6] However, Mr. Zawodny testified from personal knowledge, gained through observation, of the changes made in the processing operations at the Polytech plant since the videotapes were made. None of those changes establishes an impermissible repair process, and instead they relate to matters other than the physical repair processes performed on the LFFPs.

The government also argued that the videotapes do not depict the repair process for every kind of camera Jazz imported. However, Mr. Zawodny's testimony, based on his personal knowledge stemming from his position with Jazz, presented unrebutted evidence allowing the court to conclude that the repair process was permissible regardless of differences in camera make or model.

The court finds the testimony of Mr. Zawodny credible, based on his demeanor, his demonstrated knowledge of Polytech's processes and the precision with which he gave his responses to questioning. His testimony was bolstered by his explanation of the

---

[5] This evidence is consistent with the findings of the District Court for New Jersey and, with respect to Kodak shells, of the International Trade Commission's administrative law judge that the Polytech facility operates in conformity with the permissible repair doctrine. *See Fuji Photo Film Co. Ltd. v. Jazz Photo Corp.*, 249 F. Supp. 2d at 445-47; *ITC Enforcement Initial Determination* at 91-92.

[6] The documentation submitted by plaintiff and admitted into evidence shows that these cameras were refurbished in or around late July of this year. *See* Pl.'s Exs. 17, 20.

processes demonstrated on the videotapes.  Based on this evidence, and the evidence

concerning inventory control, as discussed elsewhere in this opinion, the court finds by a

preponderance of the evidence that all of the cameras in the two shipments at bar were

refurbished by a process at Polytech that constituted permissible repair, as established by

the Court of Appeals in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d at 1106-07.

> B.  Plaintiff Has Satisfied a Requirement of "First Sale" by Establishing by a
> Preponderance of the Evidence that All of the Subject Cameras Were Repaired Using
> Shells Collected from Photo Processors Located in the United States, Except for Cameras
> Repaired from Shells Purchased from Seven Buck's

Plaintiff has presented sufficient, unrebutted evidence to establish that the shells

collected by Photo Recycling and subsequently used by Polytech in producing LFFPs at

issue in this case were collected from photo processors in the United States.

Mr. Silvera's testimony established that the shells Photo Recycling collected in the

United States were purchased from photo processors in the United States or from

independent collectors who certified that they provided Photo Recycling with shells only

from United States photo processors.[7]  No evidence of record rebuts or otherwise casts

doubt on Mr. Silvera's testimony or the documentary evidence supporting it.  Plaintiff

established, through testimony of its witnesses at trial and documents pertaining to

inventory control, the necessary identification between the shells collected, directly or

indirectly, from photo processors and the finished LFFPs in the two subject shipments.

---

[7] Mr. Silvera also testified, based on his knowledge of the industry, that 85% of
shells are processed at the same store where the original camera was purchased.  He
offered no documentary evidence to support this statement.

It is undisputed that the two subject entries contain some LFFPs repaired from shells obtained from a source other than Photo Recycling and that this other source of shells was Seven Buck's, Inc.[8] The evidence shows that Jazz bought these shells directly from Seven Buck's and sent them from California to Polytech in China. Jazz did not offer any evidence that the terms of the contract with Seven Buck's required that Seven Buck's provide only shells collected in the United States. Nor is there any evidence that the Seven Buck's shells were collected, directly or indirectly, from U.S. photo processors. Unlike the independent shell collectors with whom Photo Recycling contracted, Seven Buck's did not provide Jazz any certification that they collected the shells solely in the United States or from U.S. photo processors.

Jazz contends that the Seven Buck's shells underwent two sorting operations to remove foreign shells, one done under Mr. Zawodny's observation in California, prior to shipment of the shells to China, the other performed in China under Polytech's standard procedures. Jazz asks the court to conclude that the double sorting is as reliable, if not more reliable, a measure of first sale than collection from a photo processor in the United States. The court is unable to reach such a conclusion on the evidence presented.

As discussed previously, any sorting process Jazz is able to conduct to exclude foreign-sold shells is subject to inherent limitations that permit a camera with a wrapper printed in English but first sold in a country other than the United States to remain in the

---

[8] Plaintiff's records, as admitted into evidence, indicate that the LFFPs resulting from Seven Buck's shells comprise a significant portion of the two entries. Determining the exact quantity will require the segregation of the merchandise, a subject discussed *infra*.

chain of production. Plaintiff did not introduce evidence establishing that English-label disposable cameras are not sold in foreign countries. Although there was testimony that the Polytech sorting process was capable of detecting and removing from production shells of a type not typically sold in the U.S. market, no evidence was introduced to establish that English-labeled cameras that *are* typical of the U.S. market are not also sold abroad, in English-speaking countries or elsewhere. There is no evidence that any such cameras would necessarily be identified as "inactive for U.S. production" by Polytech.

The findings of fact the court has made concerning sorting of shells have significant implications for the cameras made from the shells provided to Polytech by Photo Recycling and, in contrast, for the cameras made from the shells provided to Polytech by Jazz after purchase from Seven Buck's. For the Photo Recycling shells, which have been shown to have been collected from U.S. photo processors, the court's findings of fact, and reasonable inferences drawn from those findings of fact, support the conclusion that the only shells included in the mix that resulted from cameras that did not undergo first sale in the United States would have been previously reloaded shells and tourist shells. This conclusion stems in part from the presumption of regularity arising from the enforcement by Customs of the Exclusion Order, under which commercial importation of LFFPs infringing Fuji's patents is prohibited.

As discussed previously, the evidence establishes that Polytech sorted to exclude from production those shells displaying indications of previous reloading. Such shells,

according to the testimony of Mr. Zawodny, are identifiable by the presence of the black tape, by the presence of replacement parts, or by the absence of an original label.

The remaining possibility is the presence of tourist shells. As noted previously, there is no evidence of record that the subject shipments included any cameras refurbished from tourist shells. The only evidence of record pertaining to the likelihood of the presence of tourist shells among shells collected from U.S. photo processors is that they would exist at a percentage of much less than one percent. The sorting employed by Polytech, though inherently less than foolproof, is sufficient, on the facts of this case, to establish that Jazz has met its burden of establishing first sale for the cameras refurbished from shells collected from photo processors in the United States. Regarding the remaining cameras, *i.e.*, those refurbished from Seven Buck's shells, there has been no showing that shells from LFFPs first sold abroad will be confined to reloaded shells and tourist shells. There is no evidence from which the court may draw an inference that shells from cameras first sold abroad would be rare or nonexistent among the shells bought from Seven Buck's. The evidence that two sorting operations were performed on these shells is insufficient because, as discussed above, sorting has inherent limitations.

The court cannot ignore the limitations in the sorting process where the sorting operation is relied upon not only to remove any tourist shells present, but also to remove *all* shells from cameras first sold abroad, including those shells sold in the U.S. market, or imported from abroad, for which no connection is established to a U.S. photo processor. Two, or even more, sorting operations are not sufficient to overcome this lack of proof concerning the location of sale of the camera when it was new. For these

reasons, plaintiff has not met its burden of establishing, by the preponderance of the evidence, that the LFFPs refurbished from Seven Buck's shells satisfy the requirement of patent-exhausting first sale in the United States.

### C. Plaintiff Has Satisfied a Requirement of "First Sale" by Establishing by a Preponderance of the Evidence that, at the Time the Cameras Were Repaired, a System Was in Place to Identify and Remove Shells from Previously Reloaded Cameras

Mr. Zawodny presented unrebutted testimony that the Polytech facility sorts and excludes from processing shells in a condition indicating previous reloading. As noted *supra*, the so-called "reloaded reloads" were the primary source of infringing cameras according to the ITC administrative law judge. *See ITC Enforcement Initial Determination* at 65. Jazz established, by a preponderance of the evidence, that previously reloaded shells are recognizable by physical characteristics, such as the lack of an original wrapper, the presence of black tape on the repaired camera shell, or the presence of replacement parts. On the subject of replacement parts, Mr. Zawodny testified that a full-width replacement back used to repair a Kodak LFFP appears physically different from the original, and that Polytech's sorting system would exclude such shells from the reloading process.

From all the evidence plaintiff presented on the sorting process employed by Polytech, together with the evidence on inventory control, discussed elsewhere in this opinion, the court concludes that plaintiff has met its burden of establishing that the LFFPs at issue were not refurbished from previously reloaded shells.

D.  Plaintiff Has Satisfied a Requirement of "First Sale" by Establishing by a Preponderance of the Evidence that, at the Time the Cameras Were Repaired, a System Was in Place to Identify and Remove, Based on Non-Proprietary Information, Shells of Cameras Indicating First Sale Outside the United States

Plaintiff established by a preponderance of the evidence that Polytech had a sorting system in place at the time the subject cameras were processed.  That evidence showed that the shells, during the sorting process, are checked for several criteria including make, model, whether they were previously reloaded, whether they have any foreign language or markings indicating they were first sold in a country other than the United States, whether they are of a type not typical for the U.S. market, and whether they are in good enough condition to be repaired.  Particularly relevant to the issue of tourist shells was Mr. Zawodny's testimony that the shells are sorted at the Polytech facility to accept for reloading only those shells that are of specific models and that do not have foreign language on the package.  This sorting process is part of the same process whereby reloaded shells, defective shells, and shells without an original wrapper are removed from those shells designated for repair.

The language of the original wrapper is an indication of the country in which the shell was intended to be sold, according to the ITC Enforcement Initial Determination. *ITC Enforcement Initial Determination* at 35.  Defendant has not established that there is any other publicly-available information upon which a company repairing LFFP shells could rely to remove shells first sold in a market other than the United States.

By establishing collection of the shells from U.S. photo processors, and by presenting evidence of sorting to exclude from processing, according to information available to Jazz, tourist shells that may have been present, Jazz established by a

preponderance of the evidence that the LFFPs in the subject shipments that were repaired using shells other than the Seven Buck's shells satisfy the requirement of patent-exhausting first sale.

It appears that sorting for shells of foreign-sold cameras by examining the packaging for foreign language may be an over- and under-inclusive sorting process. It may be over-inclusive, in that this court has no evidence before it foreclosing the possibility that bilingually or multi-lingually labeled LFFPs, or LFFPs not labeled in English, are sold in some places in the United States. Similarly, it may be under-inclusive, because this court has no evidence showing that English-labeled LFFPs may be sold in English-speaking countries other than the United States. Due to the inherent limitations in the sorting process, the court is unable to conclude, under the facts and circumstances presented by this case, that first sale may be established by evidence of sorting that is not accompanied by evidence that the shells were collected from photo processors in the United States.

### E. Plaintiff Met Requirements of "First Sale" and "Permissible Repair" by Establishing by a Preponderance of the Evidence that it Had, at the Time the Cameras Were Repaired, an Inventory Control System to Track the Shells it Designated for Use in Repairing Cameras Destined for the United States

Plaintiff has established with unrebutted testimonial, video and documentary evidence that during the time the subject merchandise was refurbished, and during the time the shells used for that process were acquired, it had a system in place based on "Master Lot Numbers" ("MLNs") that tracked a group of shells purchased by Photo Recycling or Jazz from point of shell purchase to LFFP reimportation into the United States. The evidence showed that MLNs are assigned by Jazz, and Photo Recycling and

Polytech coordinate their activities with Jazz to maintain the MLN system throughout the entire process. Mr. Zawodny testified that boxes containing MLNs are sorted and processed one at a time to prevent commingling of one MLN with another and that at the conclusion of the repair process in China, the LFFPs are packed into cartons for shipment to the United States. The documents submitted by Jazz, and admitted into evidence, corroborate Mr. Zawodny's testimony concerning the tracking of merchandise by MLN.

An adequate inventory control system is required so that "first sale" and "permissible repair" can be established for the particular cameras in the two shipments. The court concludes, based on findings of fact, that plaintiff has satisfied this inventory control requirement.

VI. SEGREGATION OF THE CAMERAS REFURBISHED USING SEVEN BUCK'S SHELLS

At a status conference held on November 1, 2004, the court informed the parties of its tentative findings of fact and conclusions of law concerning the first sale and permissible repair issues. Those tentative findings of fact and conclusions of law are set forth in this opinion as adopted findings of fact and conclusions of law, as are additional findings of fact and conclusions of law that are needed to resolve the issues for which additional proceedings were necessary after November 1, 2004. One of those issues in dispute between the parties, and requiring additional proceedings, was the issue of segregation of the merchandise. The court had raised, during plaintiff's closing argument on October 18, 2004, the question whether cameras made from Seven Buck's shells could be segregated. The issue had not been factually resolved by the close of trial.

The court reopened the trial record for the purpose of allowing the parties to introduce evidence on the segregation issue. Plaintiff produced three one-page "Inspection Reports," each of which were presented with multi-page attachments presenting tables of numbers, which plaintiff offered for the purpose of demonstrating correspondence between various MLNs, including MLN 463 that was assigned to the Seven Buck's shells, and the numbers on the individual cartons (each containing sets of cameras) in the two shipments. Defendant at first objected to the admission of the document into evidence on grounds of authentication and hearsay and also questioned whether the document, even if it were to be ruled admissible, reliably could be used to establish segregation of the merchandise.

To determine the issue of whether the tables attached to the three Inspection Reports corresponded to the labeling of the cartons in the two shipments so as to allow segregation, the court, pursuant to authority granted by 28 U.S.C. § 2643(b), entered, on November 5, 2004, an Order for an Expedited Administrative Determination. The Order directed, *inter alia*, that Customs conduct a physical examination of the merchandise and its packaging and report to the court whether the documentation offered by plaintiff in support of segregation, when compared to marks and labels present on the packaging, provided a means to identify the cameras related to MLN 463. The Order directed that representatives of plaintiff be allowed to be present for the examination, to participate in the administrative proceeding, and to submit its own report of the examination. It also allowed counsel for both parties to be present and to participate in the administrative proceeding.

Both parties submitted, on November 8, 2004, reports on the administrative proceeding and the examination. The reports are in agreement that all of one entry and a portion (approximately 60 percent, according to plaintiff) of the other entry were examined using the documentation provided by plaintiff. They also agree that the examination was sufficient to allow complete and accurate reporting in response to the court's inquiries and, in defendant's words, "to draw clear conclusions about whether merchandise from Master Lot Number 463 can be identified." *Def.'s Resp. Pursuant to Order for Expedited Administrative Determination* at 2. Plaintiff reported, *inter alia*, that its representatives "reported that they were able to conduct the segregation precisely, using the Inspection Reports provided by plaintiff." *Pl.'s Interim Report Concerning Segregation & Mot. For Order Directing Completion of Segregation & Release of Segregated Merchandise* at 2.

The Customs report is far from a model of clarity. As a threshold observation, some of the lack of clarity in the report appears to be the result of painstaking effort to preserve defendant's then pending objection to the admissibility of the documentation plaintiff offered on the issue of segregation (which objection defendant later waived by stipulating to the admissibility of that documentation). Taking such pains in the report was unnecessary because the Order expressly noted the admissibility objection and viewed it as premature "in view of the administrative proceeding," and because the Order indicates that the documentation was to be relied upon for purposes of the examination.

The Customs report also appears to take great pains to emphasize the observation by Customs, not disputed by plaintiff, that the individual cartons in the two shipments are

not labeled according to Master Lot Number. This observation is also irrelevant to the information sought by the Order. Were the cartons labeled with MLNs, the documentation plaintiff submitted would be unnecessary for segregation on a carton-by-carton basis. As the Order indicated, the examination of the cartons together with the documentation was needed to determine "whether the information in that document, together with any other information plaintiff may submit or communicate to Customs in the proceeding ordered herein, corresponds to labels, markings or other information in or on the LFFPs, boxes, cartons, or other packaging so as to indicate a relationship between Master Lot Number 463 and specific LFFPs or packages of LFFPs." *Order for Expedited Administrative Determination* at 3. Nevertheless, the Customs report contains the statement that "Customs has no independent means of identifying which of the LFFPs in the subject shipment are related to Master Lot Number 463." *Def.'s Resp. Pursuant to Order for Expedited Administrative Determination* at 2. "In Customs' view, the markings on the cartons that were examined do not establish which LFFPs are related to Master Lot Number 463. Accordingly, in the absence of a finding by the Court that the aforementioned documents submitted by plaintiff are wholly authentic and reliable, these LFFPs cannot be accurately identified and segregated from the balance of the merchandise." *Id.*

Despite the above-quoted language, the court interprets the Customs report, read in its entirety, to be in agreement with the report of plaintiff that the documentation submitted by plaintiff enables identification and segregation of the cartons in the two shipments that are associated with MLN 463. Certain statements in the Customs report

cause the court to find there is no disagreement between the parties that the documentation allowed identification of the individual cartons containing the cameras of MLN 463. For example, the Customs report states as follows: "We note that Import Specialist Dan Johnson has indicated which cartons, allegedly associated with Master Lot Number 463, were actually examined by placing check marks and his initials next to the line corresponding to those cartons on the attached copy of plaintiff's submission (as discussed in more detail below)." *Def.'s Resp. Pursuant to Order for Expedited Administrative Determination* at 2 (footnote omitted). The checkmarks appear on the copy beside each line reference to MLN 463 listed in the handwritten tables.

After taking the deposition of a witness in Hong Kong whose availability for a video conference Jazz arranged, defendant stipulated to the admissibility of the Inspection Reports and attachments as business records of Jazz. Those documents are ordered to be admitted to the record in these proceedings as Plaintiff's Exhibit 23. At the motion of plaintiff, consented to by defendant, the court also admits the deposition transcript into evidence as Plaintiff's Exhibit 24.

<u>A. Findings of Fact on the Segregation Issue</u>

The court adopts a finding of fact, based on unrebutted evidence, that plaintiff's Master Lot Number system of inventory control, addressed previously, assigned a single MLN (MLN 463) to the shells Jazz purchased from Seven Buck's and the reloaded cameras that Polytech produced from these shells. MLN 463 is associated with the Seven Buck's shells and resulting cameras by various business records produced by plaintiff. *See* Pl.'s Ex. 19.

Based on all the evidence presented on the segregation issue, including in particular the Inspection Reports and the handwritten tables attached to them, and also including the report of Customs made in the administrative proceeding, the court reaches the finding of fact that the Inspection Reports (including their attached handwritten tables) allow segregation of the specific cartons in the two shipments that contain the cameras of MLN 463.

Based on the handwritten tables attached to the Inspection Reports, the court adopts the finding of fact that the shipment contains inner cartons in which cameras from MLN 463 are commingled with cameras from other of plaintiff's Master Lot Numbers. The cartons in which this commingling occurred are identified on the handwritten tables.

### B. Conclusions of Law on the Segregation Issue

Plaintiff's burden of proof of showing both first sale and permissible repair by a preponderance of the evidence applies to each camera in the two shipments. Accordingly, plaintiff is required to establish that the cameras refurbished from Seven Buck's shells are segregable, on a direct identification basis, from the remaining cameras. Plaintiff has met, by a preponderance of the evidence, its burden of proof as to this segregation, with the exception of the several cartons in which cameras made from shells purchased from Seven Buck's were commingled with other cameras in the shipment.

Defendant pointed out, and the court agreed, that the handwritten Inspection Report tables show that some cartons contain LFFPs from MLN 463 and also contain cameras from other MLNs. Plaintiff does not dispute this point and has not offered any evidence upon which those commingled cameras may be sorted. Accordingly, the

plaintiff has not met its burden of proof establishing segregation of those particular cartons. The court concludes that the cameras in cartons shown by the handwritten tables to contain cameras from MLN 463 and to also contain cameras from other MLNs do not satisfy the first sale requirement and are determined by the court, by application of the Exclusion Order, to be excluded from entry.

## VII. Application of USCIT R. 62(a)

Rule 62(a) of this court provides that "[e]xcept as stated herein or as otherwise ordered by the court, no execution shall issue upon a judgment nor shall proceedings be taken for enforcement until the expiration of 30 days after its entry." Plaintiff urges this court to order the release of the merchandise on the day judgment is entered, through an immediately enforceable judgment order, and hence is urging this court not to allow any automatic stay pursuant to USCIT R. 62(a). Its argument is that Jazz needs immediate release of the merchandise because of its precarious financial status and that the government would not be injured by the loss of its opportunity to seek a stay preventing the release of the merchandise pending appeal. The United States objects to any shortening of the 30-day period.

After considering the arguments of the parties on this point and the evidence of record, the court has decided to shorten the automatic stay period to 10 days. The court believes this result balances the interests of, and in particular the likelihood of harm to, both parties. The court notes, moreover, that the 10-day automatic stay period it is determining to be appropriate for this case conforms with the automatic stay period in

effect for the district courts under the analogous Rule 62(a) of the Federal Rules of Civil Procedure.

The court has conducted the proceedings in this case on an expedited basis, with the consent of both parties. Approximately two weeks elapsed from filing of the summons and complaint on October 4, 2004 to the last day of trial (October 19, 2004). The court informed the parties of its tentative findings of fact and tentative conclusions of law on two issues in the case–first sale and permissible repair–on November 1, 2004, after which time additional proceedings were necessary, as discussed above, on the issue of segregability of the merchandise. The administrative proceeding addressed to the segregation issue produced reports to the court that were filed on November 8, 2004. A 30-day automatic stay period would be two-thirds as long as the time consumed from filing of the case to entry of judgment.

The considerations leading to the expedited trial schedule were understood by both parties. They include the bankruptcy proceeding involving Jazz, in which Fuji is the primary creditor. The public record of those proceedings disclose that a motion is pending to convert the bankruptcy proceedings from reorganization under chapter 11, to liquidation under chapter 7, of Title 11, United States Code. Another consideration relevant to the need for expedited trial, which consideration had been apparent to the court and the defendant from the pleadings Jazz filed on the record in Court No. 04-00442, brought in this court under a claim of jurisdiction under 28 U.S.C. § 1581(i), was that Customs had detained a number of shipments of Jazz's merchandise other than the two shipments involved in this case.

The 30-day stay provided for under Rule 62(a) applies only if the court takes no action to shorten this time period. Rule 62(a) was amended in 1986 to allow the court, in its discretion, to make an exception to the automatic 30-day stay. A consideration underlying the change in the rule apparently was the problem posed by perishable merchandise or by other situations in which time is of the essence. *See* Practice Comment to USCIT R. 62.

Although USCIT R. 62(a) clearly grants the court discretion to shorten the 30-day period, there is scant case law providing guidance on the standard to apply in deciding whether, and by how much, to shorten the automatic stay period. More common are those motions seeking, under Rule 62(d), a stay pending appeal longer than the 30 days provided under Rule 62(a). The court considers the shortening of a stay to involve the same considerations as do the extending of a stay. In *American Grape Growers Alliance v. United States*, 9 CIT 505, 507 (1985), the Court stated that "[t]he crux of the matter, as it should be, is the question of whether the stay will *avoid* an injury or *cause* an injury." (emphasis in original). The criteria the court applies to grant a stay are four fold: (1) likelihood of success of the party seeking relief; (2) whether plaintiff will suffer irreparable harm; (3) the balance of harm to the parties involved; and (4) any public interest that should be served. *Id.* The first factor has been met in part, as Jazz has established the admissibility of some of its merchandise.

### A. Findings of Fact on the Rule 62(a) Issue

The court makes a finding on which it is basing its decision to shorten the Rule 62(a) period for an automatic stay. This finding is independent of any consideration

of Jazz's financial status. Specifically, the court finds that the subject merchandise is likely to be significantly less valuable to Jazz if it is released too late for Jazz to have a meaningful chance of selling it during the current holiday selling season. The court takes judicial notice of the importance of the holiday selling season to retailers, including Jazz's customers.[9] Moreover, factual evidence recently admitted to the record upon defendant's motion, as discussed *infra*, establishes that Jazz has an immediate need to fill current orders. Allowing the ordinary stay of 30 days would mean that Jazz would be unable to enforce the judgment entered by the court until December 18, 2004. By that time, and allowing for the time needed to get the merchandise into retail channels, practically all of the holiday selling season will have passed. The court believes that the consideration concerning the holiday selling season and Jazz's need to fill current orders, by itself, is sufficient in the context of this case to support a decision to shorten the stay period. While the merchandise is not "perishable," it is in an analogous state, its commercial importance to the plaintiff dependent significantly on its availability for sale in the very near future. The court also notes that Congress viewed cases involving the exclusion of merchandise as deserving of expedited adjudication and judicial review. *See* 19 U.S.C. § 1499(c).

---

[9] Jazz repeatedly has emphasized the importance of the holiday selling season to its business, *e.g.*, in pleadings in the related Court No. 04-00442. *See Pl.'s Mot. for Entry of a Temporary Inj.* at 3 (Sept. 16, 2004).

B. Absence of Factual Record Sufficient to Eliminate 10-Day Automatic Stay Period

The court may take notice from the public record in the bankruptcy proceeding that Fuji, a creditor participating in those proceedings, is seeking to effect the conversion of the proceedings from reorganization of Jazz under chapter 11, to liquidation of Jazz under chapter 7, of the Bankruptcy Code. Fuji filed the motion to convert on August 2 of this year. The Bankruptcy Court is currently scheduled to consider that motion on January 28, 2005, though it may consider it earlier if events require.[10]

At a status conference, the court offered defendant the opportunity to move to place on the record evidence relevant to Jazz's financial status as it relates to the issue of whether, and how long, there should be an automatic stay of judgment. On November 12, 2004, defendant moved to supplement the record with a transcript of deposition testimony of Jazz's controller. The court has granted defendant's motion. The deposition testimony establishes that Customs released to Jazz ten containers of LFFPs with a value estimated at "close to $2 million." This fact, which plaintiff does not contest, corroborates the court's finding that Jazz has failed to demonstrate that allowing defendant a reasonable time (in this instance, the ten-day automatic stay provided under the Federal Rules of Civil Procedure) is likely to cause Jazz irreparable harm. The deposition testimony, as mentioned previously, also corroborates that Jazz has a pressing need to obtain goods to fill current orders.

---

[10] On November 17, 2004, defendant filed a motion to leave to file a status report. That status report stated that a hearing to consider Fuji's motion to convert previously scheduled for November 19, 2004 had been changed to January 28, 2005. The court hereby grants defendant's motion for leave to file the status report.

As part of the pleadings in Court No. 04-00442, Jazz filed two documents that relate generally to the issue of its immediate need for the release of merchandise.[11] On October 28, 2004, Jazz filed with the court a report "concerning matters requiring immediate determination." Appended thereto were certain confidential documents offered to show business exigencies supporting the need for an immediate determination. Plaintiff did not move to reopen the record or otherwise move to admit these documents into evidence, and they have not been admitted into evidence.[12]

Such evidence as is available on the record to this court is insufficient to support a factual conclusion that Jazz will have to cease business operations if it does not obtain immediate release of the specific merchandise this court has found to be admissible. Also, the evidence on the record before this court is insufficient to establish that a time period of 10 days between entry of judgment and enforcement of that judgment will

---

[11] In the pleadings filed in that preceding action, plaintiff submitted an affidavit of Jazz Chief Executive Officer Jack Benum, dated September 26, 2004. In that affidavit, Mr. Benum stated that: unless Jazz secures relief from this court it is expected to be forced out of business within days; selling LFFPs represented 85% of Jazz's business; due to Customs action Jazz has run out of merchandise and is without cash flow; without release of the subject merchandise Jazz will suffer cancellation of customer orders and likely loss of future business. Jazz also filed a cash flow report in the previous case. Neither has been admitted to the record in this case. Even had plaintiff done so, the court concludes that those documents would not have established the likelihood of harm to Jazz sufficient that it would convince this court to dispense with a 10-day automatic stay. The affidavit was not accompanied with corroborating evidence. The cash flow report does not provide the court an independent basis to conclude that the court's allowing for a 10-day stay period is likely to injure Jazz.

[12] These documents, even had they been admitted to the record, would not be sufficient to cause this court to conclude, in the context of all the evidence of record, that the 10-day automatic stay period should not apply.

cause Jazz such harm that this court should deny defendant a meaningful opportunity to obtain a stay pending appeal.

## C.  Conclusions of Law on the Rule 62(a) Issue

The purpose of the 30-day stay provided for in Rule 62 of this Court's Rules, and the 10-day stay provided by Rule 62(a), Fed. R. Civ. Pro., is to allow a losing party an opportunity to secure a stay pending appeal.  The opportunity to seek such a stay is a legitimate and necessary element in the judicial process.  Further, the United States has a legitimate interest in preventing the entry of merchandise it believes to be in violation of the Exclusion Order.  The factor of "public interest to be served" also favors the position of defendant that it should have a reasonable opportunity to seek a stay pending appeal. Neither side disputes that if the merchandise were released, there would be no opportunity for subsequent redelivery.  For these reasons, the court will not eliminate the ability of defendant to seek a stay pending appeal, nor does it wish, on the facts presented by this case, to shorten the time the Court of Appeals will need to consider any motion to stay to a period less than that ordinarily applying to civil cases.  Some balance must be struck between the competing interests of Jazz to obtain expeditious release of the portion of the subject merchandise for which it has established admissibility, and the interests of the defendant to have a motion to stay considered by the Court of Appeals.[13]

---

[13] Counsel for defendant stated at a point late in the proceedings that while defendant would object to any shortening of the 30-day automatic stay, it would need an absolute minimum automatic stay of five days in order to seek a stay pending appeal. The court declines, on the particular facts shown in this case, to shorten the automatic stay of Rule 62(a) to five days.  As discussed herein, plaintiff has not shown that the 10-day period, which is the period provided for under the Federal Rules of Civil Procedure, is likely to cause it irreparable harm.  During a five-day period, defendant

The court concludes that defendant United States will suffer no significant prejudice from the shortening of the automatic stay to 10 days, the same amount of time that applies in civil cases in the district courts.[14]  In addition, the court, on November 1, 2004, notified the parties of preliminary conclusions of law and fact on permissible repair and first sale and explained the need for the court to obtain a resolution of the issues concerning segregation of the merchandise tentatively found to be inadmissible.  This action placed the defendant on notice as to the probable outcome of this case and provided an opportunity for defendant to begin to prepare a motion to stay prior to entry of judgment.

The court finds that irreparable harm, stemming from the unavailability, for almost all of the holiday selling season, of the merchandise found to be admissible by this court, is likely to befall Jazz if the full 30-day stay is required.  The court also finds that it is possible to balance the competing hardships of the parties by providing for a 10-day stay.  In light of the foregoing, the court will order that its judgment directing the release of all merchandise deemed admissible within the two subject entries will be stayed for ten business days, which period will expire on December 2, 2004.  The standard 30-day stay of enforcement under Rule 62 will not apply.

would need to seek a stay in this court, then if unsuccessful prepare and file a motion to stay in the Federal Circuit.  The voluminous record in this case would limit the opportunity of the Court of Appeals to consider fully the issues that may be raised in such a motion.

[14] Because, under this Court's Rules (as under the Federal Rules of Civil Procedure), the ten-day period does not include intervening holidays and weekends, the actual time period of the automatic stay is the equivalent of 15 calendar days, or half the time period that would apply were the court to make no special ruling on the automatic stay period provided for under USCIT R. 62(a).

VIII.  RESOLUTION OF REMAINING OUTSTANDING MOTIONS

A.  Continuing Objections by Defendant to Admissibility of Exhibits

At trial, defendant objected to the admission of plaintiff's documentary exhibits, claiming that the proffering witnesses failed to authenticate certain documents within those exhibits in accordance with Fed. R. Evid. 901.  Specifically, defendant argued that the proponents of the evidence could not show that the evidence is what the proponents claim it to be.  At trial, the court admitted most of plaintiff's exhibits but segregated some of the documents into two parts (designated "A" and "B") of plaintiff's Exhibits 1 through 7 and 9 through 14,[15] noting defendant's objection to for the record and giving the government an opportunity to further explain the objection in post-trial briefing.[16] Upon review of the government's argument, plaintiff's memorandum in support of admission, and the trial record, the court overrules the defendant's objections and affirms its ruling to admit the exhibits without condition, with the exception of a small number of documents.[17]

---

[15] Portions of plaintiff's exhibits 1 through 7 and 9 through 14 contained pages of the exhibits to which the defendant did not object.  Parts B of the same exhibits contained those pages that the defendant specifically objected on authentication grounds.

[16] The government raised the same objection to plaintiff's exhibits 16, 17, 19 and 20.  A deposition of Mr. Jack Benum, Chief Executive Officer of Jazz, was held on Friday, October 15, 2004, for the limited purpose of addressing the issue of admissibility of the documents.  At trial, after resumption of court proceedings, the government withdrew its additional hearsay objection to Plaintiff's Exhibit 20 (pre-marked as Plaintiff's Exhibit 4) but preserved its authentication objection for further consideration by the court.

[17] Defendant objected to Bates number 78 of Plaintiff's Exhibit 7B on the additional ground that the document is incomplete and unreliable.  The court sustains defendant's objection and strikes Bates number 78 from the trial record.  Additionally,

Plaintiff sought to lay the foundation for the admissibility of the exhibits at issue through the testimony of Messrs. Silvera and Zawodny that the documents were business records of either Photo Recycling or Jazz, and that they qualified for admission under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6). The government contended that Messrs. Silvera and Zawodny could not properly authenticate the business records because, in its view, these two witnesses "were without knowledge of the process by or location at which . . . the documents were generated." *Def.'s Post-Trial Br.* at 22.

The court disagrees with defendant's contention. "The proponent need not establish a proper foundation through personal knowledge; a proper foundation 'can rest on any manner permitted by Federal Rule of Evidence 901(b) and 902.'" *United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir. 2004) (citing *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002)). The government's objection to the admissibility of the business records amounts to an objection that plaintiff did not proffer a witness or affidavit from the companies that generated all the documents contained within the documents proffered as business records. *See Def.'s Post-Trial Br.* at 22; Tr. at 238-297, 417-45, 477-504, 557-63, 635-40.

The contention that each and every business document offered into evidence must be separately authenticated by a witness from the entity that prepared the document, however, has no basis in law. *See United States v. Jakobetz*, 955 F.2d 786, 800-01

the court reserved its evidentiary ruling on Bates numbers 223 and 229 of Plaintiff's Exhibit 17; plaintiff withdrew its motion to admit those pages into the record in these proceedings during a sidebar discussion.

(2d Cir. 1992) (holding that "[e]ven if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity" (citation omitted)).  Defendant's narrow reading of the requirement of Fed. R. Evid. 901 essentially would swallow the 803(6) business records exception and prevent most entities from using documents at trial that are germane to the operation of their businesses.

Mr. Silvera testified that he is familiar with the documents contained in the business record of Photo Recycling and that the exhibits at issue were in fact business records generated and/or maintained or integrated during the ordinary course of Photo Recycling's business.  *See* Tr. at 225-47, 257-97.  Although Mr. Zawodny could not testify definitively that every document within the subject exhibits were "records of operation" maintained by Jazz in the ordinary course of business, he was able to identify the exhibits as business records and explain the contents of each document and their significance to Jazz's business operations.  *See* Tr. at 463-98.  After a deposition was taken of Jazz's Chief Executive Officer, the government conceded that the documents used to elicit testimony from Mr. Zawodny were, in fact, business records of Jazz and stipulated that Plaintiff's Exhibit 20 contains documents that are maintained as part of Jazz's business records.  The government withdrew its hearsay objection to Plaintiff's Exhibit 20, but reserved its objection under Fed. R. Evid. 901 to all business records proffered by Mr. Zawodny that were not produced by Jazz.

The witnesses purport that the documents at issue are either business records of Photo Recycling or Jazz.  The trial testimony of  Messrs. Silvera and Zawodny and the

government's consent to waive its hearsay objection in light of Mr. Benum's deposition have, for purposes of Fed. R. Evid. 901, established that the documents are what the proponents claim; therefore, the grounds for any authentication objection have been extinguished. Fed. R. Evid. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); *see* MCCORMICK ON EVID. § 292 (5th Ed.) ("[W]hen the business offering the records of another has made an independent check of the records, has integrated them into their own business operation, or can establish accuracy by other means, the necessary foundation may be established.") The law of the Federal Circuit instructs that it is of no consequence that the witnesses who laid the foundation for admissibility did not generate, prepare, or maintain the records, or even work at the record-keeping entity as an employee. *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391-92 (Fed. Cir. 1996); *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 503-04 (Fed. Cir. 1995); *see also Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987); *United States v. Basey*, 613 F.2d 198, 201 n.1 (9th Cir. 1979), *cert. denied*, 446 U.S. 919 (1980).

The court has no reason to question the testimony and circumstantial evidence that these exhibits are actually business records of either Photo Recycling or Jazz or the testimony of the witnesses relating to their reliance on such records. Any questions as to the extent of a witness' personal knowledge of the contents of the business records will be considered by the trier of fact, in this case the trial court, only in determining the credibility of the witness and the weight to be accorded to the solicited testimony.

*See United States v. Stavroff*, 149 F.3d 478, 484-485 (6th Cir. 1998) (citation omitted).

Defendant also objected, on authentication grounds, that some of the documents are not on the letterhead of the entities that generated them and that some contain text in Chinese. That some of the documents contained within the business records are written in a foreign language or not produced upon company letterhead does not defeat admissibility but instead affects only the probative value of such documents, a determination that is reserved for the trier of fact.

### B. Defendant's Motion for Judgment on Partial Findings

At the close of plaintiff's case in chief, defendant moved for judgment on partial findings pursuant to Rule 52(c) of this Court. Defendant argued that Jazz failed to establish, by a preponderance of the evidence, that the shells used to produce the cameras in the two subject entries were first sold in the United States. To make its argument, defendant pointed to what it claimed were several deficiencies in Jazz's case in chief, including the fact that Jazz presented no evidence to establish the origin of the Seven Buck's shells. Tr. 645-64. During trial, the court reserved ruling on defendant's Rule 52(c) motion and now denies this motion for the reasons that are subsumed in the findings of fact and conclusions of law set forth in this opinion.

### C. Defendant's Motion to Reopen the Trial Record

On October 19, 2004, the day following the conclusion of the trial, defendant made an emergency motion to reopen the trial record for the single and limited purpose of introducing one "sample" Jazz disposable camera that, according to the motion, was drawn by Customs at random from one of the two entries at issue. Defendant sought to

introduce this camera into evidence through proffered testimony of a Customs senior import specialist, Mr. Dan Johnson. That testimony would be offered solely for the purpose of establishing chain of custody, *i.e.*, that the senior import specialist had obtained the camera from one of the entries and had marked the sample with the entry number.

Defendant represented that the camera it offered for admission into evidence, revealed, following removal of Jazz's label, original bilingual labeling in English and French and that such labeling indicated that the camera originally was intended for sale in a foreign country. Counsel for defendant acknowledged that the camera was in their possession since the first day of trial but argued that the expedited trial schedule prevented the government from inspecting the samples and "obtain[ing] a full appreciation of their relevance prior to trial." *Def.'s Emergency Mot. to Reopen the R.* at 2. In its motion, defendant claimed that this camera is "newly discovered evidence that is highly relevant to the first sale issue" and maintained that Jazz would be in no way prejudiced by its introduction because plaintiff should be aware of the contents of its entries. *Id.* at 3. During the court's emergency hearing held at the request of defendant and conducted by telephone because counsel for the United States was not present in New York at the time, the court orally denied defendant's motion and explained why that motion, as written, was not being granted.

It is well established that it is within the trial court's discretion to reopen the record. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 551 (1983); *see also Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1379-80 (Fed. Cir. 1999). In

determining whether or not to reopen the evidentiary record, a trial court considers the

probative value of the evidence proffered, the proponent's explanation for failing to offer

such evidence earlier and the likelihood of undue prejudice to the proponent's adversary.

*See Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1160 (1st Cir. 1996) (citing *Rivera-*

*Flores v. Puerto Rico Tel. Co.*, 64 F.3d 742, 746 (1st Cir. 1995); *Joseph v. Terminix Int'l*

*Co.*, 17 F.3d 1282, 1285 (10th Cir. 1994); 6A JAMES WM. MOORE ET AL., MOORE'S

FEDERAL PRACTICE ¶ 59.04[13], at 59.33 (2d ed. 1993)); *see also Confederated Tribes of*

*the Warm Springs Reservation of Or. v. United States*, No. 02-5167, 2004 U.S. App.

LEXIS 11249, at *11 (Fed. Cir. June 8, 2004) (non-precedential).  Defendant's motion

failed to satisfy these three factors.  First, the court could accord little probative weight to

a single camera (one out of a total of approximately 160,000 cameras in the two entries)

offered by itself to show that the plaintiff had failed to meet its burden of establishing

first sale.  The camera would be relevant to the issue of the effectiveness of the shell

sorting activity undertaken by Polytech, but meaningful findings of fact on this issue

would require statistically valid sampling of both entries.

Regarding the second factor, the conducting of these proceedings, on an

expedited basis, allowed the United States and its agency, Customs, the opportunity to

examine the merchandise that was the subject of this litigation.  The court recognizes that

the parties conducted discovery and trial proceedings according to an accelerated

schedule; however, the court notes that the parties agreed to the expedited schedule

during pre-trial conferences and also agreed to the court's pre-trial order.  Moreover, the

court sees no reason why defendant could not have moved into the record during trial a

group of twenty cameras that, according to the motion, Customs had removed from the two shipments and sent to the court at the request of counsel for the United States. These cameras were placed on the Exhibit Table, in plain sight in the courtroom, where they remained throughout the proceedings. At no time during trial did the government attempt to introduce into evidence any of these twenty cameras. These cameras, and the specific camera described by defendant, could have been used in the government's cross-examination of Mr. Zawodny, who testified concerning the sampling conducted by Polytech.

Additionally, the merchandise that was the subject of this action was in the custody or constructive custody of Customs since its importation in late August of this year. Customs made three administrative determinations with respect to that merchandise prior to the filing of this case. It made an initial determination to detain the merchandise pursuant to 19 U.S.C. § 1499(c)(1) (2000). It denied the release of the merchandise on September 24 and 26, 2004, thus making the admissibility determination that is the subject of 19 U.S.C. § 1499(c)(1) and that constituted the exclusion determination addressed in 19 U.S.C. § 1514(a)(4). Finally, Customs denied Jazz's administrative protest of the exclusion determination, Jazz's contesting of which resulted in this action. Thus, Customs had numerous opportunities to examine and sample the merchandise during the time available for considering Jazz's pleas for administrative relief.

Under the third factor, defendant's motion on its face demonstrates the likelihood of undue prejudice to the plaintiff. As submitted, the motion was manifestly unfair in

declining to present the plaintiff with any meaningful opportunity to present new evidence and, instead, limiting the introduction of evidence to just one of the twenty cameras on the Exhibit Table. Defendant's motion would have the court restrict plaintiff's opportunity to rebut this evidence to cross-examination of Mr. Dan Johnson "regarding his selection of these samples and his markings of the entry numbers on the outer boxes of these cameras." *Def.'s Emergency Mot. to Reopen the R.* at 3.

The court, during the emergency hearing on defendant's motion, informed the parties that in giving its reasons for denying the motion it was not indicating that it necessarily would deny any motion to reopen the trial record. As the court then notified the parties, were a motion of the general type made by defendant to avoid undue prejudice, it would have to provide for opening of the trial record to allow both sides the opportunity to produce evidence on the issue or issues for which admission into evidence of the single camera was being offered. Although defendant, during a telephonic conference on the record concerning the issue of segregation of merchandise, orally renewed its denied motion, defendant did not submit another written motion during these proceedings to reopen the trial record.

### D. Other Outstanding Motions

The parties and *amicus curiae* made a number of other motions that remain outstanding. The court disposes of these motions as follows: (1) plaintiff's motion to consolidate Court Nos. 04-00442 and 04-00494, filed on October 4, 2004 is denied as moot; (2) *amicus curiae's* motion to file post-hearing brief on legal issues, filed October 15, 2004 is granted; (3) *amicus curiae's* motion to file post-trial brief, filed on

October 20, 2004 is granted; (4) Letters of *amicus curiae* filed on October 21, 2004, October 22, 2004, and October 25, 2004 are ruled out of order and are struck from the record; (5) defendant's motion to strike plaintiff's "Report Concerning Matters Requiring Immediate Determination" filed on October 29, 2004 is denied as status reports from parties are an appropriate means of communicating with the court; (6) *amicus curiae's* motion to file a brief on waiver of automatic stay filed on November 5, 2004 is denied as beyond the scope of the issues for which *amicus curiae* status was previously granted; (7) *amicus curiae's* motion to file a reply brief on waiver of the automatic stay filed on November 8, 2004 is denied as beyond the scope of the issues for which *amicus curiae* status was previously granted; (8) defendant's motion to supplement the record and to strike *amicus curiae's* motion to reopen the record filed on November 12, 2004 is granted and the November 10, 2004 deposition of Joseph M. Weber is admitted as Defendant's Exhibit A; (8) defendant's motion to strike plaintiff's status report dated November 13, 2004, filed on November 16, 2004, is denied, plaintiff having the right to respond to defendant's motion of November 12, 2004 to reopen the record.  Other motions made orally or in writing are hereby denied as moot or subsumed in the judgment.

IX. DISPOSITION OF THE IMPORTED MERCHANDISE

The court will order immediate release of the merchandise for which plaintiff has met its burden of establishing admissibility, subject only to the 10-day automatic stay of enforcement of the judgment, discussed previously.  The remaining merchandise in the two entries is excluded from entry.  Because, as the parties agree, that excluded merchandise has remained in the constructive custody of Customs, an order for

redelivery is unnecessary. The ordinary disposition of merchandise entered in good faith but subsequently deemed not to be entitled to admission is the opportunity for the importer to export or destroy the excluded merchandise under the supervision of Customs. *See* 19 C.F.R. § 158.45(c) and 158.41(c) (2004). Defendant has not sought otherwise. The court concludes that the excluded merchandise shall be allowed to be exported or destroyed under the supervision of Customs.

X. CONCLUSION

For the foregoing reasons, the court finds that plaintiff has met, by a preponderance of the evidence, its burden of establishing the admissibility of those LFFPs at issue in this case that are neither included in plaintiff's Master Lot Number 463, nor commingled in inner cartons with LFFPs from plaintiff's Master Lot Number 463. Because plaintiff has established, for those LFFPs, that it has satisfied the legal requirements of first sale, permissible repair, and segregation, the court concludes that those LFFPs are outside the scope of the General Exclusion Order against *Certain Lens-Fitted Film Packages*, USITC Inv. No. 337-TA-406, Pub. No. 3219 (1999) and are entitled to entry and release from the custody of Customs.

For reasons also stated previously, plaintiff has failed to meet its burden of establishing that the LFFPs in the subject shipments that are included in plaintiff's Master Lot Number 463 are outside the scope of the General Exclusion Order. Plaintiff further has failed to establish segregation of the LFFPs that are located in inner

cartons that contain LFFPs from Master Lot Number 463 and also contain LFFPs of other Master Lot Numbers. These LFFPs are excluded from entry and may be exported or destroyed, under the supervision of Customs. Judgment for plaintiff in part and for defendant in part will be entered accordingly.

_____/s/_____

Timothy C. Stanceu
Judge

Dated:      November 17, 2004
              New York, New York