# United States Court of Appeals for the Federal Circuit

05-1096, -1109, -1175

JAZZ PHOTO CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant,

and

FUJI PHOTO FILM CO., LTD.,

Movant-Appellant.

John M. Peterson, Neville Peterson LLP, of New York, New York, argued for plaintiff-cross appellant. With him on the brief were Curtis W. Knauss and Maria E. Celis, of New York, New York; and, George W. Thompson and Catherine Chess Chen, of Washington, DC.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and David S. Silverbrand, Attorney. Of counsel on the brief were Karen P. Binder, Assistant Chief Counsel, and Beth C. Brotman, Senior Attorney, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Lawrence Rosenthal, Stroock & Stroock & Lavan LLP, of New York, New York, argued for movant-appellant. With him on the brief were Matthew W. Siegal and Kevin C. Ecker. Of counsel was Angie M. Hankins. Also of counsel were Will E. Leonard and Harvey B. Fox, Adduci, Mastriani & Schaumberg, LLP, of Washington, DC.

Appealed from: United States Court of International Trade

Judge Timothy C. Stanceu

# United States Court of Appeals for the Federal Circuit

05-1096, -1109, -1175

JAZZ PHOTO CORPORATION,

Plaintiff-Cross-Appellant,

v.

UNITED STATES,

Defendant-Appellant.

and

FUJI PHOTO FILM CO., LTD.,

Movant-Appellant.

_____

DECIDED:  February 28, 2006

_____

Before NEWMAN, LOURIE, and SCHALL, <u>Circuit Judges</u>.

LOURIE, <u>Circuit Judge</u>.

The United States and Fuji Photo Film Co., Ltd. ("Fuji") appeal from the final decision of the Court of International Trade ordering the United States Bureau of Customs and Border Protection ("Customs") to release for entry certain Jazz Photo Corporation ("Jazz") lens-fitted film packages ("LFFPs") from two shipments that were denied entry by Customs on August 25 and 26, 2004, and ordering Customs to allow Jazz to complete the process of segregating the two shipments of LFFPs under the supervision of Customs.  <u>Jazz Photo Corp. v. United States</u>, No. 04-00494 (Ct. Int'l Trade Nov. 17, 2004) ("<u>Final Judgment</u>").  Customs excluded the two shipments of

Jazz's LFFPs based on a General Exclusion Order and Order to Cease and Desist ("Exclusion Order") of the United States International Trade Commission (the "Commission") issued June 2, 1999, under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 (2000) ("Section 337"). Because the Court of International Trade did not err in holding that Jazz proved the affirmative defense of first sale and permissible repair for the LFFPs released for importation, did not err in ordering Customs to allow Jazz to complete the process of segregating the two shipments of Jazz's LFFPs under Customs' supervision, did not err in denying Fuji leave to intervene, did not err in not joining Fuji as a necessary party, and did not abuse its discretion in denying Fuji the ability to attend the entire trial and access the trial record, we affirm.

BACKGROUND

This is the fourth case to come before this court involving Jazz's importation of LFFPs, also known as "disposable cameras," "single use cameras," or "one-time use cameras." The initial proceeding began in 1998, when Fuji filed a complaint at the Commission, alleging that 27 respondents, including Jazz, were violating Section 337 by importing into the United States articles that infringed fifteen patents owned by Fuji or by importing articles that were produced by means of a process covered by the claims of Fuji's patents. Jazz Photo Corp. v. Int'l Trade Comm'n, 264 F.3d 1094, 1098 (Fed. Cir. 2001) ("Jazz I"). The Commission held that 26 respondents, including Jazz, infringed all or most of the claims in suit of fourteen of Fuji's patents and it issued an Exclusion Order on June 2, 1999, prohibiting the importation into the United States of certain LFFPs. We stayed the Commission's order pending appeal. On August 21, 2001, we reversed the Commission's judgment of patent infringement "with respect to LFFPs for

which the patent right was exhausted by first sale in the United States, and that were permissibly repaired," and affirmed the Commission's order for all other cameras. Id. at 1110.

Fuji also filed a second action at the Commission in June 2001 seeking institution of a formal enforcement proceeding to enforce the Exclusion Order and to impose civil penalties. Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n, 386 F.3d 1095, 1097-98 (Fed. Cir. 2004) ("Jazz II"). In May 2002, the administrative law judge found that Jazz had violated the Exclusion Order with respect to some LFFPs imported by Jazz from August 21, 2001, through December 12, 2003; that determination became the final determination of the Commission on July 27, 2004. Subsequently, on January 14, 2005, the Commission imposed a $13,675,000 civil penalty against Jazz.

In addition to the two actions before the Commission, Fuji filed suit against Jazz for patent infringement in the United States District Court for the District of New Jersey on June 23, 1999, seeking damages and injunctive relief for direct and indirect infringement of its LFFP patents between 1995 and August 21, 2001. Fuji Photo Film Co. Ltd. v. Jazz Photo Corp., 394 F.3d 1368, 1371 (Fed. Cir. 2005) ("Jazz III"). After a jury trial, the court entered judgment on March 18, 2003, that Jazz was liable for willful infringement of Fuji's patents and awarded damages of $29,765,280.60. Id. at 1372. We affirmed that court's judgment on January 14, 2005.

The present appeal arises from Customs' decision to exclude from entry two shipments of LFFPs that Jazz imported at the Port of Los Angeles/Long Beach on August 25 and 26, 2004. All the subject LFFPs were "reloaded" cameras, also known as "refurbished" cameras, that were initially manufactured by Fuji or one of its licensees

05-1096, -1109, -1175                    -3-

(Kodak, Concord, or Konica) and, after being used by consumers and collected following photo processing, were processed by Polytech Enterprise Limited ("Polytech") in China. Jazz Photo Corp. v. United States, 353 F. Supp. 2d, 1327, 1329 (Ct. Int'l Trade 2004) ("Decision"). That processing included fitting the camera with new film, and in some instances with new flash batteries, repairing the camera case to exclude light following the film reloading operation, repackaging, and relabeling under Jazz's trademark. Id. at 1329-30. Some of the subject LFFPs were processed using spent disposable cameras or "shells" that Polytech obtained from a collector of shells, Photo Recycling Enterprise, Inc. ("Photo Recycling"). Id. at 1341. The remaining subject LFFPs were processed using shells that Jazz acquired from a company known as Seven Buck's, Inc. ("Seven Buck's") and provided to Polytech. Id. Jazz's inventory control system identified the reloaded cameras processed using Photo Recycling's shells separately from the reloaded cameras processed using Seven Buck's shells. Id.

Customs concluded that Jazz had failed to prove that the subject LFFPs were outside the scope of the Exclusion Order and excluded the two shipments from entry on September 24 and 26, 2004. Id. at 1329. Jazz then filed a protest to Customs' decision under 19 U.S.C. § 1514(a), and Customs denied Jazz's protest on September 29, 2004. Id. On October 4, 2004, Jazz challenged Customs' denial of its administrative protest in the Court of International Trade under 28 U.S.C. § 1581(a), seeking an order that the subject LFFPs were admissible into the United States and an order directing Customs to release the subject LFFPs.

After a bench trial, the Court of International Trade held on November 17, 2004, that Jazz established by a preponderance of the evidence that the subject LFFPs

processed using Photo Recycling's shells were first sold in the United States and permissibly repaired, and thus that those LFFPs should be released by Customs for entry. Id. at 1363. The court also held that Jazz did not establish by a preponderance of the evidence that the subject LFFPs processed using Seven Buck's shells were first sold in the United States, and thus that those LFFPs were properly excluded from entry by Customs. Id. at 1364.

The court made factual findings supporting its conclusions on three issues: permissible repair, first sale, and segregation. First, the court relied on the testimony of Michal Zawodny, the Quality Assurance Manager for Jazz, in concluding that Polytech refurbished all of the subject LFFPs in a process that constituted permissible repair. Id. at 1347-48. Second, the court credited the testimony of Leon Silvera, the President of Photo Recycling, in holding that the subject LFFPs processed using Photo Recycling's shells were first sold in the United States. Id. at 1348-49. The court relied in part on a "presumption of regularity," reasoning that any "new single use cameras identified by the Exclusion Order that are commercially imported by anyone other than Fuji or one of its licensees would be unlawful imports and presumed to be excluded from the U.S. market." Id. at 1334. The court also observed that while this presumption does not extend to the LFFPs called "tourist" cameras because the Exclusion Order contains an exception allowing noncommercial importations, there was "no record evidence from which the court may conclude that the subject merchandise actually includes cameras refurbished from tourist shells." Id. at 1338. At the same time, the court found that the subject LFFPs processed using Seven Buck's shells were not first sold in the United States. Finally, the court found that the subject LFFPs processed using Seven Buck's

shells were located in Master Lot Number 463, and thus could be segregated from the subject LFFPs made using Photo Recycling's shells that were not included in Master Lot Number 463. Id. at 1354.

On November 17, 2004, the court entered final judgment in favor of Jazz as to the subject LFFPs processed using Photo Recycling's shells, and in favor of the government as to the subject LFFPs processed using Seven Buck's shells. Final Judgment, slip op. at 1-2. The government and Fuji timely appealed that portion of the court's order permitting entry of the subject LFFPs processed using Photo Recycling's shells, and Jazz filed a cross-appeal contesting the exclusion of the subject LFFPs made using Seven Buck's shells.

Jazz's cross-appeal has now been rendered moot by the May 16, 2005 order of the United States Bankruptcy Court for the District of New Jersey that, pursuant to the parties' settlement agreement, ordered the sale of substantially all of Jazz's assets to Ribi Tech Products LLC ("Ribi"). Ribi subsequently took ownership of the subject LFFPs processed using Seven Buck's shells and exported them for sale overseas. Thus, the only portion of the Final Judgment on appeal is the entry and segregation of the subject LFFPs processed using Photo Recycling's shells. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the Court of International Trade's conclusions of law de novo. Ford Motor Co. v. United States, 286 F.3d 1335, 1340 (Fed. Cir. 2002). Following a trial, we review the court's factual findings for clear error. Id. "The clear error standard requires us to accept the Court of International Trade's findings of fact unless we are left with a

'definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  In addition, we review the Court of International Trade's decisions on evidentiary issues for abuse of discretion.  F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1031 (Fed. Cir. 2000).

As a threshold matter, it is important to state that this case has not been mooted by the release of the subject LFFPs processed using Photo Recycling's shells into the stream of commerce following the Final Judgment.  "Mootness of an action relates to the basic dispute between the parties, not merely the relief requested.  Thus, although subsequent acts may moot a request for particular relief or a count, the constitutional requirement of a case or controversy may be supplied by the availability of other relief." Intrepid v. Pollock, 907 F.2d 1125, 1131 (Fed. Cir. 1990) (citing Powell v. McCormack, 395 U.S. 486, 496-97 (1969) (The mootness of Powell's claim for injunctive relief related to his seating in Congress held not to moot the case because his claim for back salary remained a viable issue.); Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 353 (1922) (suit to restrain contract violation held not mooted with the contract's expiration if there is also a request for damages that is capable of ascertainment)).

Here, although the release of the subject LFFPs processed using Photo Recycling's shells into the stream of commerce removed the possibility of the relief originally requested, viz., exclusion of the goods from entry, the government may still seek other relief by demanding redelivery of the goods and imposing liquidated damages on Jazz for failure to redeliver.  Therefore, there remains a "definite and

05-1096, -1109, -1175                    -7-

concrete" controversy between Jazz and the government concerning the exclusion of the subject LFFPs processed using Photo Recycling's shells.

    I.  <u>Entry of the Subject LFFPs</u>

        A.       <u>Affirmative Defense</u>

           1.  <u>First Sale</u>

On appeal, the government argues that the Court of International Trade erred as a matter of law in holding that Jazz had demonstrated a patent-exhausting first sale for the subject LFFPs processed using Photo Recycling's shells. The government asserts that under the first sale defense articulated in <u>Jazz I</u>, Jazz did not satisfy its burden. According to the government, the court's reliance, even in part, upon the presumption of regularity is incorrect for three reasons: first, the Exclusion Order does not prohibit the importation of used foreign LFFPs that were not first sold in the United States; second, the Exclusion Order allows the importation of foreign LFFPs by tourists that were not first sold in the United States; and third, ample evidence in the record rebuts any presumption that commercial quantities of unauthorized LFFPs were not in the United States market. The government points out that Jazz was able to import substantial quantities of infringing LFFPs notwithstanding the Exclusion Order; the Commission found that 90% of the LFFPs imported by Jazz from 1995 to December 2003 were found to have infringed Fuji's patents. Fuji essentially repeats the arguments made by the government on this issue and also contends that the testimony credited by the court was inadmissible as lay opinion and hearsay. Fuji also argues that absent a presumption of regularity, there is no credible evidence as to the place of first sale for at least 15% of the subject LFFPs processed using Photo Recycling's shells.

Jazz responds that the court correctly applied the presumption of regularity, albeit in a limited way, to hold that the subject LFFPs processed using Photo Recycling's shells satisfied the first sale requirement. Jazz points out that the court only applied the presumption of regularity to new LFFPs or single use cameras that had not been repaired, and did not apply the presumption to cameras repaired abroad whose importation had previously been held to infringe Fuji's patents or violate the Exclusion Order. According to Jazz, the court properly applied the presumption of regularity because the government did not offer clear evidence to the contrary rebutting the presumption. Jazz also argues that the court properly held that Jazz overcame the presumption of correctness attached to Customs' decision to exclude the subject LFFPs because the government did not present a case-in-chief and the only evidence admitted at trial as to whether the subject LFFPs satisfied the first sale and permissible repair defense was provided by Jazz.

We agree with Jazz that the court did not err in holding that Jazz satisfied the first sale defense for the subject LFFPs processed using Photo Recycling's shells. We articulated the affirmative defense of first sale and permissible repair in Jazz I, holding that the "unrestricted sale of a patented article, by or with the authority of the patentee, 'exhausts' the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold." 264 F.3d at 1005. We reasoned that "when a patented device has been lawfully sold in the United States, subsequent purchasers inherit the same immunity under the doctrine of patent exhaustion" so long as the device has been permissibly repaired. Id. The party raising the affirmative defense has the burden of establishing it by a preponderance of the evidence. Id. at 1102.

Moreover, we have defined preponderance of the evidence in civil actions to mean "the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." Hale v. Dep't of Transp., Fed. Aviation Admin., 772 F.2d 882, 885 (Fed. Cir. 1985).

Here, Jazz bears the burden of proving by a preponderance of the evidence its affirmative defense, and the trial court has the responsibility to weigh the evidence and evaluate the credibility of witnesses to determine whether Jazz satisfied its burden. State Indus., Inc. v. Mor-Flo Indus., Inc., 948 F.2d 1573, 1577 (Fed. Cir. 1991) ("The weighing of conflicting evidence is a task within the special province of the trial judge who, having heard the evidence, is in a better position than we to evaluate it."). At trial, Jazz relied on evidence from Silvera to establish its affirmative defense of first sale. Silvera testified that Photo Recycling obtained approximately 80% of its shells from national retailers in the United States operating internal photo processing labs, 10% to 15% of its shells from independent photo processors or small, wholesale photo finishing labs in the United States, and the remaining 10% to 12% of its shells from shell collectors in the United States.[1] He also testified that, as an industry standard, at least 85% of disposable cameras developed at photo processing locations, such as national retailers or independent photo processors, were usually purchased from that same location. Further, Silvera testified that Photo Recycling required that the shells it purchased from shell collectors be accompanied by letter certifications indicating the shells in the cartons had been collected from photo processors in the United States. In

---

[1]     Photo Recycling also collects shells from countries other than the United States, but those shells are shipped directly to Hong Kong from those countries instead of being shipped to Photo Recycling in New Jersey. Decision, 353 F. Supp. 2d at 1343.

05-1096, -1109, -1175                              -10-

addition, Silvera testified that Photo Recycling sold over 90% of the shells it had collected to Polytech.

Based on Silvera's demeanor, demonstrated knowledge of Photo Recycling's business activities, and general knowledge of the business of collecting spent shells, the trial court credited his testimony and made factual findings corresponding to his assertions. Decision, 353 F. Supp. 2d at 1342-43. The trial court then concluded that Jazz had presented "sufficient, unrebutted evidence to establish that the shells collected by Photo Recycling and subsequently used by Polytech in producing LFFPs at issue in this case were collected from photo processors in the United States." Id. at 1348. We conclude that the trial court's factual determinations were not clearly erroneous and its legal conclusion was not erroneous as a matter of law.

To be sure, Jazz did not present direct evidence that each of the subject LFFPs processed using Photo Recycling's shells were first sold in the United States; Jazz's case is circumstantial. However, Jazz may carry its burden by presenting its case based upon circumstantial evidence. Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986) (citing Michalic v. Cleveland Tanker, Inc., 364 U.S. 325, 330 (1960)) ("It is hornbook law that direct evidence of a fact is not necessary. 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'"). Here, the circumstantial evidence offered by Silvera tended to show that the subject LFFPs processed using Photo Recycling's shells were first sold in the United States. Because the court was entitled to give weight to that evidence, we see no error in the court's conclusion that Jazz met its burden.

We reject the government and Fuji's argument that the trial court erred as a matter of law in applying the presumption of regularity to hold that Jazz satisfied its evidentiary burden. "The 'presumption of regularity' supports official acts of public officers. In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties." Bernklau v. Principi, 291 F.3d 795, 801 (Fed. Cir. 2002) (citing Butler v. Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001)). In the context of Customs' decisions, we have applied the presumption of regularity to presume that "the import specialist properly performed his duties." Ford Motor Co. v. United States, 286 F.3d 1335, 1340 (Fed. Cir. 2002) (citation omitted).

Here, the presumption of regularity operated to presume that certain new LFFP shells collected by Photo Recycling were not illegally imported into the United States contrary to the Exclusion Order because Customs would have excluded any infringing shells. However, the court made clear that the application of the presumption of regularity did <u>not</u> absolve Jazz of its burden of proof: "Jazz must meet its evidentiary burden through factual evidence establishing first sale that goes beyond the mere fact that the shells were obtained in the United States." Decision, 353 F. Supp. 2d at 1334. Accordingly, Jazz offered evidence that at least 85% of the shells collected by Photo Recycling from photo processors in the United States were purchased at the same location as where processing occurred. It follows that the trial court's application of the presumption of regularity was limited to the remaining minority of shells that, according to Silvera's testimony, were not purchased at the same location as where processing occurred. The court's application of the presumption of regularity was also limited to "new single use cameras" and did not include used foreign LFFPs. Id. Moreover, the

government did not offer any evidence, much less clear evidence to the contrary, that would rebut this presumption for those specific LFFPs. Nor did the government introduce any evidence tending to show that the performance of Customs' officers was irregular. Based on the evidence presented, we conclude that the trial court's limited reliance on the presumption of regularity to hold that Jazz had established first sale by a preponderance of the evidence was not erroneous as a matter of law. Our conclusion of course is limited to the particular circumstances of the Exclusion Order at issue in this case.

Moreover, we disagree with the government that the trial court's application of the presumption of regularity eviscerated the literal requirements of the first sale defense articulated in Jazz I. Whether Jazz met its burden of proof by a preponderance of the evidence was decided by the trial court based on its weighing of the evidence. The government takes issue with the court's statement that "Jazz and similarly situated companies cannot reasonably be expected to have access to information that does or may exist, and would be expected to be proprietary to Fuji and the licensees, from which the location of first sale of a shell could be ascertained to a certainty." Id. at 1333. However, there is no requirement that Jazz establish the defense of first sale to a certainty or that Jazz submit all commercially available evidence as to first sale to meet its burden. Because the trial court permissibly weighed the evidence as to whether the subject LFFPs processed using Photo Recycling's shells satisfied the first sale defense, there is no error in the court's conclusion that Jazz met its burden of proof.

Finally, the government's other arguments on this issue are not persuasive. The government asserts that the presumption of regularity does not apply here because it

does not provide a barrier to the importation of used foreign LFFP shells entered lawfully under the Exclusion Order, it does not rule out the possibility that domestic photo processors could have obtained LFFPs from tourists (who may lawfully bring LFFPs into the United States under the Exclusion Order), and it is rebutted by the Commission's finding that Jazz had violated the Exclusion Order with respect to some of its product imported from various facilities in China from 1995 to December 2003. We conclude that the government's objections, while raising potential issues concerning the application of the presumption of regularity in general, do not establish that the trial court erred in applying the presumption to the specific facts of this case.

To meet its burden of proof, Jazz was not required to prove to a certainty that there were no used foreign shells, infringing shells, and tourist shells in the subject LFFPs processed using Photo Recycling's shells. Here, the theoretical possibility that used foreign shells, infringing shells, and tourist shells may exist in Photo Recycling's shells did not necessarily mean that the specific LFFPs at issue in this case were processed from those shells. Indeed, the government did not present any evidence at trial that any of the Photo Recycling shells used to make the subject LFFPs actually used foreign shells, infringing shells, or tourist shells. The court thus credited testimony offered by Silvera that there was a "very tiny" number or <u>de minimis</u> amount of tourist shells that were first sold outside the United States that "could possibly have been among the shells Photo Recycling collected from photo processors in the United States." <u>Decision</u>, 353 F. Supp. 2d at 1338, 1343 ("[T]here is no record evidence from which the court may conclude that the subject merchandise actually includes cameras refurbished from tourist shells.").

Moreover, the Commission's ruling that Jazz imported infringing cameras into the United States from August 21, 2001, through December 12, 2003, does not establish that the Photo Recycling shells used to make the subject LFFPs included infringing shells. Similarly, that used foreign shells could have been imported into the United States does not establish that the Photo Recycling shells used to make the subject LFFPs were processed using any of those shells. We recognize that the government was not required to present evidence that the LFFPs at issue were actually processed from used foreign shells, infringing shells, and tourist shells. However, in the absence of such conflicting evidence, the court was entitled to give weight to Jazz's evidence. Accordingly, there is no error in the court's conclusion that Jazz established first sale by a preponderance of the evidence.

## 2. Permissible Repair

On appeal, the government argues that the Court of International Trade erred in holding that Jazz established permissible repair for the subject LFFPs processed using Photo Recycling's shells because Jazz did not carry its burden of demonstrating that the repair process consisted of no more than the eight permissible steps identified in Jazz I. According to the government, the court's failure to identify "various minor operations" in Polytech's processing of the cameras is important because there is evidence in the record that Polytech engaged in full-back replacements in the past, which amounted to impermissible reconstruction. The government also contends that the court improperly relied on two 2003 videotapes as depicting the repair process performed by Polytech, pointing out that the videotapes did not accurately reflect the process used to make the subject LFFPs. Fuji essentially repeats the arguments made by the government on this

issue and also contends that issue preclusion prevents the court from relying on the two 2003 videotapes to establish permissible repair because, in a separate enforcement proceeding decided by the Commission in 2004, Jazz II, the Commission found that those same videotapes were not sufficient to show permissible repair.

Jazz responds that the court's failure to identify "various minor operations" did not mean that the subject LFFPs were impermissibly repaired because Polytech had stopped engaging in full-back replacements at the time the subject LFFPs were produced. According to Jazz, the government's argument that the various minor operations included full-back replacements is mere speculation that is unsupported by evidence. Jazz also argues that the court's reliance on the two 2003 videotapes as showing permissible repair was proper because the Commission's finding as to the admissibility of a piece of evidence has no preclusive or binding effect on a court's determination regarding that same evidence in a separate proceeding. Jazz points out that the two videotapes were offered for a narrower purpose in this case than in the enforcement proceeding before the Commission, and that Zawodny testified as to all the steps of permissible repair depicted in the videotapes.

We agree with Jazz that the trial court did not err in holding that the subject LFFPs were permissibly repaired in accordance with the standard set forth in Jazz I. We held in Jazz I that the following eight steps were permissible repair, not prohibited reconstruction: "(1) removing the cardboard cover, (2) cutting open the plastic casing, (3) inserting new film and a container to receive the film, (4) replacing the winding wheel for certain cameras, (5) replacing the battery for flash cameras, (6) resetting the

counter, (7) resealing the outer case, and (8) adding a new cardboard cover." 264 F.3d

at 1099. We reasoned:

> "The decisions of [the Supreme] Court require the conclusion that reconstruction
> of a patented entity, comprised of unpatented elements, is limited to such a true
> reconstruction of the entity as to 'in fact make a new article,' after the entity,
> viewed as a whole, has become spent. In order to call the monopoly, conferred
> by the patent grant, into play for a second time, it must, indeed, be a second
> creation of the patented entity. . . . Mere replacement of individual unpatented
> parts, one at a time, whether of the same part repeatedly or different parts
> successively, is no more than the lawful right of the owner to repair his property."
> This right of repair, provided that the activity does not "in fact make a new
> article," accompanies the article to succeeding owners.

Id. at 1103 (quoting Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336,

346 (1961) (internal citations omitted)). Here, the subject LFFPs were permissibly

repaired under the standard set forth in Jazz I because the steps did not in fact make a

new single use camera.

The trial court found, based on Zawodny's testimony, that the processing

undertaken by Polytech for the subject LFFPs was:

> [1] opening of the body of the shell, [2] replacement of the advance wheel, [3]
> replacement of the film and of the battery (if a flash camera), [4] resetting the
> counter, [5] closing and repairing the case using original parts except for the
> additional molded part referred to above, [6] repackaging the refurbished camera,
> and [7] various minor operations incidental to these processes.

Decision, 353 F. Supp. 2d at 1346. The government does not challenge the trial court's

holding that the first six steps constituted permissible repair under Jazz I. However, the

government argues that the court did not properly determine whether "various minor

operations" constituted permissible repair. We disagree. While there is no bright-line

test for determining whether a device has been permissibly repaired, it does not turn on

minor details. Here, the court characterized the seventh step as "various minor

operations incidental to the first six steps." Because the first six steps did not make a

new single use camera, it follows that minor operations which were incidental to those steps also did not make a new single use camera. Moreover, even if the trial court did not identify the specifics of each minor operation, the fact that they were incidental to the first six steps indicates that the court considered them to be known processes that were permissible repair. We thus discern no error in the court's conclusion that those "various minor operations" did not make a new single use camera and thus constituted permissible repair.

We also disagree with the government's position that the court's failure to identify "various minor operations" was reversible error because it left open the possibility that the processing of the subject LFFPs included a full back replacement step, which would not have qualified as permissible repair. The trial court expressly rejected the possibility that the processing of the subject LFFPs included a full back replacement step, finding, based on Zawodny's testimony, that the "various minor operations" did not include full back replacements. Decision, 353 F. Supp. 2d at 1346. Evidence in the record supports the court's determination, demonstrating that at the time the subject LFFPs were produced, Polytech had stopped using full back replacements. Because the government has not offered any evidence to the contrary, there was no clear error in its factual finding and we thus conclude that the court properly held that the subject LFFPs were permissibly repaired under Jazz I.

In addition, the government argues that the trial court's conclusion that the subject LFFPs were permissibly repaired was incorrect because the court relied on two 2003 videotapes that did not accurately reflect the process used to make the subject LFFPs. That argument misses the point. After assessing all the evidence, the court

05-1096, -1109, -1175                    -18-

gave weight to the two videotapes based on Zawodny's testimony. Even if the government had presented any evidence to the contrary, which it did not, the trial court is in a better position to evaluate conflicting evidence than we are. Accordingly, we discern no error in the court's holding. Moreover, that the Commission accorded the two videotapes different weight in a previous proceeding, Jazz II, does not preclude the trial court from crediting the evidence in this case. The Commission's assessment of the two videotapes related to LFFPs imported by Jazz from August 21, 2001 through December 12, 2003. The subject LFFPs in this case were imported by Jazz in August 2004. Because the issue considered by the Commission was not identical to the one considered by the trial court here, the Commission's determination has no preclusive effect on the trial court's decision in this case.

B.    Segregation of Jazz's LFFPs

On appeal, the government argues that the Court of International Trade erred in ordering Customs to supervise Jazz's segregation of the LFFPs that the court deemed to be admissible and to release those LFFPs. The government contends that the court exceeded its authority by directing Customs to assist in the segregation and in ordering the release of the goods. According to the government, compliance with the court's order imposed significant administrative demands upon Customs; Jazz, not Customs, should have been responsible for segregating the admissible LFFPs from the inadmissible LFFPs.

Jazz responds that supervision by Customs was necessary to segregate the goods because the subject LFFPs were stored in a bonded warehouse owned by Customs. Jazz also contends that Customs' regulations and laws require that importers

05-1096, -1109, -1175                    -19-

segregate commingled goods under the supervision of Customs. According to Jazz, even if the court erred in ordering Customs to supervise Jazz's segregation of goods, the government has not shown how it was prejudiced by that error and does not justify reversal of the court's order.

We agree with Jazz that the trial court did not err in ordering Customs to supervise the segregation of the subject LFFPs. 19 CFR § 19.4(b)(1) provides that in Customs warehouses Customs "shall supervise all transportation, receipts, deliveries, sampling, recordkeeping, repacking, manipulation, destruction, physical and procedural security, conditions of storage, and safety in the warehouse as required by law and regulations." Id. (emphasis added). Under the regulation, Customs is obligated to supervise certain activities in its warehouse and that supervision is mandatory, not discretionary. Here, the subject LFFPs were stored in a Customs warehouse, and the segregation of those goods necessarily involved manipulation of the merchandise. Because Customs was required to supervise the segregation of the subject LFFPs in its warehouse, we see no error in the trial court's order.

Moreover, we disagree with the government that compliance with the trial court's order imposed significant administrative demands upon Customs. The court did not order Customs to segregate the subject LFFPs. Rather, the court ordered Jazz "to complete, under the supervision of Customs, the process of segregating the two shipments of LFFPs that are the subject of this action . . . to any extent that such segregation process has not already been completed." Final Judgment, slip op. at 2. The court's order makes clear that Jazz, not Customs, was responsible for segregating the admissible LFFPs from the inadmissible LFFPs. There was also no language in the

court's order suggesting that Customs was directed to "assist" in the segregation process. Thus, we conclude that the court did not err in ordering Jazz to complete the segregation of the subject LFFPs under the supervision of Customs.

## II. Intervention and Joinder

On appeal, Fuji argues that the Court of International Trade erred in denying Fuji leave to intervene. As an initial matter, Fuji claims that it has standing before this court because the trial court's denial of intervener status in a telephonic conference on October 7, 2004, was a final appealable order. Fuji then contends that, as a patent owner, it should have been permitted to intervene because its interests were not adequately represented by the government. Fuji points out that the government presented no case-in-chief and that the trial court would not have erred had Fuji been a party to the action. Fuji also asserts that 28 U.S.C. § 2631(j) does not bar intervention because this case involves intellectual property rights, and the legislative history suggests that the statute only bars intervention by those suffering "mere" economic harm in the marketplace.

In addition, Fuji argues that even if Fuji was barred from intervention by statute, it should have been joined as a necessary party because it satisfied the elements of Court of International Trade Rule 19(a): that it had an interest relating to the subject of the action such that (1) Fuji's absence impaired or impeded its ability to protect that interest or (2) Fuji's absence created a substantial risk of inconsistent obligations on the parties to the action. Specifically, Fuji contends that the trial court's holding in this case could conflict with a determination by the Commission that the LFFPs are infringing.

Jazz responds that Fuji lacks standing to appeal the intervention and joinder issues because Fuji never moved to intervene or to be joined as a party and only sought (and was granted) amicus curiae status. Jazz also asserts that Fuji was barred from intervention by the express language of 28 U.S.C. § 2631(j)(1)(A). The government agrees with Jazz on this issue. In addition, Jazz contends that joinder of Fuji was not mandatory in this case because Fuji's absence would not result in dismissal of the action and also because Fuji's absence would not result in inconsistent obligations. Jazz points out that advisory opinions issued by the Commission do not bind any agency or subject Customs to any obligations.

We agree with Jazz and the government that the court did not err in denying Fuji intervener status. Fuji's attempt to intervene fails under the plain language of 28 U.S.C. § 2631(j). The statute provides that "no person may intervene in a civil action under section 515 or 516 of the Tariff Act of 1930." 28 U.S.C. § 2631(j)(1)(A) (2005). Here, Customs denied Jazz's protest under section 515 of the Tariff Act of 1930, as amended 19 U.S.C. § 1515, and thus the express language of 27 U.S.C. § 2631(j) bars Fuji's intervention. Because the statute does not provide for any exceptions to that rule, the fact that Fuji is a patent owner does not change our conclusion.

We also agree with Jazz that Fuji was not required to be joined as a necessary party. As an initial matter, because Fuji did not seek joinder before the trial court, we consider this issue sua sponte. United States Court of International Trade Rule 19(a)(2) provides that a person shall be joined as a party in the action if

> the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (A) as a practical matter impair or impede the person's ability to protect that interest, or (B) leave any of the persons already parties subject to a substantial risk of

incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Here, Fuji's general interest in protecting its patent rights was not impaired by the trial court's ruling excluding Fuji from the case. In protests under section 515, Congress placed the responsibility of protecting Fuji's patent rights upon the government. In this case, the government has litigated both before the Court of International Trade and before us. The case primarily concerns protecting Fuji's patent rights by enforcing the Exclusion Order that was implemented by the Commission to protect Fuji's patent rights from infringement. Thus, Fuji's patent rights have been protected. Moreover, Congress specifically contemplated whether to allow parties similarly situated to Fuji to intervene and explicitly forbade such intervention through subsection 2631(j). We do not think that a party that is expressly forbidden from participating in a proceeding can logically be considered a necessary party to that proceeding.

Moreover, we disagree with Fuji that failure to join it as a defendant in this case would "open the government to the danger of inconsistent obligations." A final judgment in this case would settle conclusively the government's obligations regarding the subject LFFPs whose exclusion is being protested. Moreover, that the Commission may rule that the subject LFFPs violate the Exclusion Order in a subsequent enforcement proceeding or Advisory Opinion proceeding does not create a risk of inconsistent obligations because such a ruling would not bind Customs or change its obligations as to the specific subject LFFPs at issue here.

III.  Access to Confidential Information

Fuji argues on appeal that the Court of International Trade abused its discretion in denying Fuji the ability to attend the entire trial and access the trial record because

the court was required to, but did not, make a specific finding of harm as to Jazz that would be caused by disclosure of confidential information. According to Fuji, a document sealed under a discovery protective order does not overcome the presumption of access to documents submitted for trial.

Jazz responds that the court did not abuse its discretion in denying Fuji access to Jazz's confidential documents because the court was not required to set forth specific findings of harm to maintain the confidentiality of Jazz's documents.

We agree with Jazz that the trial court did not abuse its discretion in denying Fuji access to Jazz's confidential documents and sealing the trial record. Pursuant to the parties' stipulation, the court entered a protective order on October 20, 2004, under United States Court of International Trade Rule 26(c) restricting the disclosure of confidential or financial information, and placing such information and documents under seal. Rule 26(c)(7) provides that the court may make any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including "that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." Here, the documents at issue fall squarely within the ambit of Rule 26(c)(7) because they included Jazz's entry documents and information relating to its customers, suppliers, manufacturing processes, financial condition, and the quantity and value of its imports. Based on the record, we discern no abuse of discretion in the court's designation of those documents as confidential and in the court's order maintaining their confidentiality during discovery, trial, and after trial.

We have considered the remaining arguments and find them to be unpersuasive.

05-1096, -1109, -1175                    -24-

CONCLUSION

The Court of International Trade did not err in holding that Jazz established, by a preponderance of the evidence, the affirmative defense of first sale and permissible repair for the subject LFFPs processed using Photo Recycling's shells, did not err in ordering Customs to allow Jazz to complete the process of segregating the subject LFFPs under Customs' supervision, did not err in denying Fuji leave to intervene, did not err in not joining Fuji as a necessary party, and did not abuse its discretion in denying Fuji the ability to attend the entire trial and access the trial record. The decision of that court is therefore

AFFIRMED.